380 A.2d 311

**In re ADOPTION OF Melissa P.**

**Appeal of Patricia D.**

Supreme Court of Pennsylvania.

Argued Nov. 19, 1976.

Decided Oct. 28, 1977.

Legal Aid of Chester County, Robert L. Keogh, West Chester, for appellant.

Lamb, Windle & McErlane, Edwin Craig Kalemjian, West Chester, for appellee, Chester County Children's Service.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

■ This is an appeal from a decree of the Court of Common Pleas of Chester County, Orphans' Court Division, which involuntarily terminated the parental rights of Mrs. Patricia D. to her daughter, Melissa P.[1] The case arose as a result of a petition filed in November, 1975, by the Chester County Children's Services requesting the termination of parental rights pursuant to the Adoption Act of 1970, July 24, P.L. 620, No. 208, art. III, § 311, 1 P.S. § 311 (Supp. 1977–78) (hereinafter referred to as "Section 311"). The lower court took its action based on the authority of Section 311(1) of the Adoption Act which permits the rights of a parent to be terminated on the ground that:

[1]  Jurisdiction of the instant appeal is vested in this Court under the Appellate Court Jurisdiction Act of 1970, July 31, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp. 1977–78).

"The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . ."[2]

This Court has often held that Section 311(1) must be read in the disjunctive and that termination may be ordered *either* if the parent has evidenced for a period of six months a "settled purpose" of relinquishing parental claims *or* has, for the same length of time, "refused or failed to perform parental duties." *In re Howard,* 468 Pa. 71, 360 A.2d 184 (1976); *In re Adoption of M.T.T.,* 467 Pa. 88, 93, 354 A.2d

2. The petition filed by Chester County Children's Services also alleged that involuntary termination was justified on the basis of Section 311(2) of the Adoption Act which provides that such action may be taken if "the repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent . . ." Act of 1970, July 24, P.L. 620, No. 208, art. III, § 311(2), 1 P.S. § 311(2) (Supp. 1977–78). The lower court, however, found that the requirements of this subsection had not been shown to exist. After a review of the record, we agree that the court was correct in its decision and that the "demanding" standard of "compelling" evidence for termination under 311(2) had not been met. *In re Geiger,* 459 Pa. 636, 639, 331 A.2d 172, 173 (1975); *Adoption of R.I.,* 468 Pa. 287, 294, 361 A.2d 294, 298 (1976). The appellee agency has failed to present any evidence of "repeated and continued incapacity, abuse and neglect" on the part of appellant which "caused the child to be without essential parental care, control or subsistence" during the time she was in the custody of appellant. *In re Howard,* 468 Pa. 71, 360 A.2d 184 (1976). Even if it is argued that appellant failed to take the necessary steps to protect the child from the abuse of the stepfather, during the time the child was living with the couple, the requirements of the subsection would still not have been met. In order to terminate under Section 311(2) it is "necessary to show that the causes of the . . . abuse . . . cannot or will not be remedied by the parent." *In re Geiger, supra.* We have held that "regardless of a parent's past transgressions, a court should not terminate parental rights if the parent stands ready and able to assume the responsibility of rearing his or her child." *In re Howard, supra* 468 Pa. at 77, 360 A.2d at 187. Not only did appellant attempt to remedy the source of the abuse by encouraging her husband to enter into counseling sessions with the Ohio children's agency, but subsequently saw fit to *remove* the source of the abuse by living apart from her husband. The record is barren of

564, 567 (1976); *In re Lumiere Castel Cassen,* 457 Pa. 525, 527, 326 A.2d 377, 379 (1974); *Wolfe Adoption Case,* 454 Pa. 550, 554, 312 A.2d 793, 795 (1973). Although the hearing court failed to specify the precise portion of the subsection upon which it relied in terminating appellant's rights, a close reading of the opinion convinces us that he ordered the action because he felt that the "refusal or failure to perform" test had been complied with.[3]

The facts surrounding this appeal, as found by the hearing judge, are that in August, 1974, Melissa P., then approximately ten months of age, and her mother, the instant appellant, were living with Roland D., husband of the appellant and stepfather of Melissa, at the home of a family friend in Downingtown. On August 13th of the same year, following at least three apparently unrelated instances of physical abuse of Melissa by Roland D., the child was admitted to the Coatesville Hospital with severe bruises and discolorations on her body. Chester County Children's Services, the instant appellee, was contacted and thereafter filed a petition in the Court of Common Pleas requesting temporary custody of the child. An order was entered on September 20, 1974, fixing temporary custody of the child in the appellee agency. Later, on October 1, 1974, a hearing was held and the court found that the child was "deprived" within the meaning of the Juvenile Court Act of December

evidence to contradict her assertions that she now stands ready and able to assume the responsibility of raising Melissa.

3. Although the lower court did not discuss whether the appellant had "evidenced a settled purpose of relinquishing parental claim" for a period of six months, we do not believe we can affirm the lower court order on the basis of that test having been met. No evidence whatsoever has been introduced that at any time appellant harbored a settled purpose to relinquish her claims to Melissa. Not only did she never express such an intention, but no such inference can be drawn from her conduct. *In re Adoption of Baby Boy (Robbie),* 452 Pa. 165, 305 A.2d 36 (1973); *Harvey Adoption Case,* 375 Pa. 1, 99 A.2d 276 (1953). In fact, Mrs. D. not only "proposed a plan for her personal care of . . [Melissa] . ." but during most of the relevant six-month period was attempting to make a satisfactory home for the child. *Compare Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974).

6, 1972, P.L. 1464, No. 333, 11 P.S. § 50–101 (Supp. 1977–78) and temporary custody was again awarded to Children's Services. A third such order was entered on January 30, 1975, which additionally directed a review of the child's progress within six months upon the petition of any party.

In September, 1974, about the time of the first custody hearing in this matter, appellant Patricia D. moved with her husband to Ohio where the latter had an opportunity for employment. She resided there with her husband until January, 1976, when she returned to Pennsylvania for the involuntary termination proceeding which is the basis of this appeal. During the sixteen-month period between the time the child was taken from her custody and the date the involuntary termination proceeding commenced, appellant saw her child only once—in January, 1975, at the offices of the appellee agency. During the same interval the appellant corresponded by mail with the agency twice, once in November, 1974, and once in March, 1975. In both letters she expressed love and concern for her daughter and in the latter said she hoped to regain custody of Melissa. In the November letter she invited the agency to investigate her Ohio home to ascertain "what kind of parents we are." As a result of this communication, Children's Services of Chester County contacted an Ohio children's agency and from January, 1975 to August, 1975, (approximately three months prior to the filing of the involuntary termination petition) this Ohio agency made numerous unannounced visits to appellant's home. Additionally, during this time appellant and her husband participated in several prearranged counseling sessions with the Ohio agency. The court found that at no time during the sixteen-month period had appellant actually sent any "money, gift or other remembrance" to the child through the Chester County agency, noting, however, that for most of that time appellant and her husband were living on a $170.00 per month public assistance grant.[4] Once

4. The record indicates that appellant's husband worked at the new Ohio job for, at the most, one month before being laid off. The Davis family, at the same time, increased by one with the addition of a son.

a month Melissa's maternal grandmother and aunt (appellant's sister) visited the child at the agency bringing presents, such as clothing, toys and food. Christmas and birthday parties were also given for the child on these visits. Barbara P., appellant's sister, requested more frequent visiting privileges but this proposal was denied due to the difficulties in arranging additional visits with the foster family with whom Melissa was living. Since January, 1976, until at least the date of the hearing, Mrs. D. has been living with her sister, Barbara, in a two-bedroom apartment in Downingtown with the intention of remaining apart from her husband.

Appellant raises a two-part argument in this appeal to support her contention that the trial court committed error in concluding that the "demanding standard" necessary to support involuntary termination was met. First of all, appellant argues that the court failed to properly consider the "particular circumstances" of appellant's situation and to recognize that appellant had utilized the resources at her command in declining to yield to obstacles preventing her from performing her affirmative parental duties. Secondly, Mrs. D. maintains that the court incorrectly ascertained that appellant's mother and sister were not acting as her "proxy" in appellant's absence and in concluding that even if they were, appellant did not act reasonably under the circumstances.[5] We believe that the lower court failed to properly apply the facts of the case to the law and that, as a result, we agree with the appellant that the agency fell short of proving by a clear preponderance of the evidence

**5.** Appellant also argues that the Best Interest of the Child doctrine was a strong motivation behind the lower court's holding and that this is an improper consideration in proceedings for involuntary termination. We believe that since the statutory requirements for termination have not been met, there is no need to decide the parameters of the Best Interest of the Child doctrine in this context or whether, in fact, the trial court utilized the principle in the decision of the case. *In re Adoption of R.I., supra,* 468 Pa. at 299, n.12, 361 A.2d at 300, n.12; *In re Adoption of McAhren,* 460 Pa. 63, 68, 331 A.2d 419, 422 (1975).

that the parental rights of Patricia D. to her daughter Melissa should be terminated.[6]

This Court, in an assessment of whether a natural parent's rights to his/her child should be involuntarily terminated, has given careful and concerned thought to the role of a parent in a child's life.

"Parenthood is not . . . a mere biological status, or passive state of mind which claims and declines to relinquish ownership of the child. It is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern . . . [A parent] must exert himself to take and maintain a place of importance in the child's life . . . ." *Appeal of Diane B.*, 456 Pa. 429, 433, 321 A.2d 618, 620 (1974), quoting from *In re: Adoption of JRF*, 27 Somerset L.J. 298, 304–05 (Pa.C.P. 1972).

*See also Matter of Kapcsos*, 468 Pa. 50, 360 A.2d 174 (1976).

On the other hand we have constantly been sensitive to the fact that the finality of termination of a natural parent's rights to his child and the harsh connotations thereof carry great emotional impact on both child and parent and for that reason the law has been unwilling to terminate a natural parent's rights unless the record clearly warrants such a finding. *In re Adoption of Sarver*, 444 Pa. 507, 509,

---

**6.** We recognize the fact-finding function of the hearing judge and his unique opportunity to observe the witnesses and to apprise their credibility. *See Adoption of Baby Girl Fleming*, 471 Pa. 73, 76, 369 A.2d 1200, 1203 (1977), citing *Adoption of Farabelli*, 460 Pa. 423, 433, 333 A.2d 846, 851 (1976). However, we may not abdicate our responsibility to consider all the testimony and determine whether the Court's findings are supported by competent evidence. *Adoption of Farabelli, supra*, 460 Pa. at 427, 333 A.2d at 848; *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973). After a review of the record, we believe that the trial court's express findings of fact are supported by competent evidence. Nonetheless, we also have a responsibility to make certain that the trial court has properly interpreted the law in relationship to the express findings of facts and other uncontradicted testimony which was not expressly rejected by the trial court. While we will not usurp the trial court's right to assess the credibility of the witnesses appearing before him, we will not condone his ignoring facts which are of record and the credibility of which is not challenged.

281 A.2d 890, 891 (1971). Because of the gravity and irreversible nature of involuntary termination this Court has required the party petitioning for involuntary termination to prove by a preponderance of clear and competent evidence that the statutory requirements have been fulfilled. *Adoption of Baby Girl Fleming,* 471 Pa. 73, 369 A.2d 1200 (1977); *In re Adoption of McAhren,* 460 Pa. 63, 331 A.2d 419 (1975); *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975); *In re Adoption of RI,* 455 Pa. 29, 312 A.2d 601 (1973).

In discussing how best a parent can maintain a place of importance in a child's life, we have held that a parent has an affirmative duty to "love, protect, and support his child and to make an effort to maintain communication and association with that child." *In re Adoption of McCray, supra,* 460 Pa. at 216, 331 A.2d at 655; *see also, Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974).

Even if we were to concede, which we expressly do not, that the agency proved that for the requisite statutory period of six months, appellant, by her failure to contact her child directly or to send a gift or remembrance to her through the Chester County Children's Services [7] or to contact that agency,[8] thereby failed to perform these affirmative parental duties, we agree with appellant that the lower court did not accord proper weight to the individual circumstances of the mother and the explanations offered by her as to why her claim to her child should be honored.

"Where . . . the evidence clearly establishes that the parent has failed to perform his affirmative parental duties for a period in excess of six months, this Court then must examine the individual circumstances and any expla-

---

**7.** Appellant did testify that she occasionally, when she could afford it, sent money to her mother or sister for them to buy things for Melissa. The court below did not indicate whether he believed this testimony or whether there was any reason to reject it.

**8.** A period of six months and thirteen days elapsed between the last written communication between the parties (May 5, 1975) and the date the involuntary petition was filed (November 18, 1975). During three months of this six-month period, however, appellant was regularly communicating with the Ohio agency (from January 1975 to August 1975).

nation offered by the parent to determine if that evidence, in light of the totality of the circumstances, clearly warrants permitting the involuntary termination of said parent's parental rights and the adoption." *In re Adoption of Orwick*, 464 Pa. 549, 555, 347 A.2d 677, 680 (1975). *See also, Jacono Adoption Case*, 426 Pa. 98, 231 A.2d 295 (1967). In analyzing the explanations offered by a parent this Court has looked to whether a parent has "utilized those resources at his or her command . . . in continuing a close relationship with the child" and whether he or she has exercised "reasonable firmness" in declining to yield to obstacles. *Adoption of McCray, supra*, 460 Pa. at 217, 331 A.2d at 655. *See also, In re Adoption of Croissette*, 468 Pa. 417, 364 A.2d 263 (1976). We believe that, in light of the totality of circumstances, appellant did exercise reasonable firmness in declining to yield to obstacles which prevented her from protecting, supporting and maintaining communication and association with Melissa. In this regard it is critical to remember that Melissa had been taken by court order from the custody and care of her mother and there is no evidence on the record that this action was taken as a result of any fault or misconduct on the part of appellant. To the contrary, it is uncontested that the child was separated from her mother due to the cruelty of her stepfather. This is, therefore, unlike the situations in which a parent has voluntarily surrendered his or her child to the care of another, thereby electing to forego the exercise of important affirmative parental duties. *Adoption of Baby Girl Fleming, supra; In re Lumiere Castel Cassen, supra; Wolfe Adoption Case, supra; Matter of Kapcsos, supra.* At approximately the same time her daughter was taken from her, appellant moved with her husband to Ohio where he was promised a job. Despite the physical distance between her new home and Chester County and the fact that during most of the sixteen-month period in question, appellant and her husband and their infant son were living on $170 per month public assistance, appellant did make one trip to Pennsylvania during which she visited with Melissa. Prior

to that visit the record indicates that in September, 1974, within the period of one week, appellant made three trips from her new home in Ohio to Pennsylvania for the scheduled hearing regarding the custody of Melissa. Twice the hearing was postponed and rescheduled and appellant, despite her other family responsibilities and the financial strain, returned to Pennsylvania for each hearing. Although she did not actually see Melissa on these dates these efforts on her part must be viewed as an attempt to prevent the forfeiture of her rights to Melissa and as an expression of her love, concern and interest for the child's well-being. *Compare, In re Adoption of McCray, supra.* In addition to these trips, Mrs. D. also communicated at least twice with Chester County Children's Services advising them of her affection for Melissa and her desire to have her daughter returned.

Most importantly, she was in constant contact through visits and counseling with the Ohio children's service agency from January, 1975, until August, 1975. Although appellant did not communicate with the Chester County agency for over six months, she was, during most of this time, working with the Ohio agency. In fact the record shows that appellant was relying on the instructions of the Chester County agency to cooperate with the Ohio agency and was reasonably led to believe that such action would preserve her rights to her child. These efforts on the part of appellant were clearly made in order that she could establish an environment suitable for the return of Melissa.

The court below and the appellee have placed great emphasis on appellant's alleged failure to maintain communication with her child. To support this assertion, they cite the fact that she failed to send cards, gifts or other remembrances. To the contrary, appellant did maintain communication with her child through her mother, the child's maternal grandmother, and her sister, the child's maternal aunt.[9] It is unquestioned on this record that the grandmother and

9. As noted *supra*, these visits were held at the agency.

the aunt visited with Melissa at every available opportunity. They established a pattern of providing the child with gifts and remembrances. The record also indicates that appellant was in communication with her mother and sister with reference to her child's situation. In view of the child's age it would appear that the means employed by appellant to keep advised as to the well-being of her child were at least as effective and probably more effective than the means of communication suggested by appellee and the court below. Additionally, at great personal, financial strain, appellant did make one visit during the period in question to see Melissa.

With regard to the role of Mrs. P. and Barbara P., we believe the lower court erred in finding that they were not acting on behalf of Patricia D. in loving and supporting Melissa in the latter's absence. Pennsylvania caselaw clearly provides that Section 311(1) does not require that a parent *personally* take care of a child.

> "The responsibility of performing parental duties may be met if the parent has made reasonable arrangements for the temporary care of the child." *Wolfe Adoption Case, supra* 454 Pa. at 557, 312 A.2d at 797.

*See also, Appeal of Diane B., supra,* 456 Pa. at 434, 321 A.2d at 620. This language has been used in a context where the parent has voluntarily sought the services of an agency to provide custody during a period where the parent is, for some reason, unable to do so. We can conceive of no reason why the surrogate concept should not be equally applicable to the discharge of parental responsibilities of a parent who has lost custody of the child involuntarily. Although a parent who does not have custody must express in a positive manner, her affection for the offspring and her interest in maintaining the parental relationship, it might well be under the circumstances of a given case that the use of a surrogate would be in the most feasible and effective means to accomplish that end. In our view, such is the case here.

The lower court expressed its belief that both the grand-mother and aunt enjoyed their own familial attachments to the child and that it was "likely", at least in the case of Barbara P., that she was satisfying some emotional need of her own. It does not follow that the grandmother's and aunt's affection for Melissa excludes the possibility that they were also acting on appellant's behalf. It was erroneous to accept their personal attachment for Melissa as determinative of the question. It would be only normal for a natural grandmother and a natural aunt to possess their own reasons, in addition to the desire to fulfill appellant's expectations, for loving and caring for this child. These independent inducements may not be used to nullify the mother's own care and concern. The important inquiry is whether Mrs. D. reasonably relied on her family, and whether they were in fact aware of this reliance, to discharge some of the responsibilities that comprise the composite of parental tasks.

It is abundantly clear from appellant's testimony that she did rely on her mother and sister to love, support and communicate with Melissa in her absence. It is also clear that she intended that the arrangement was to be temporary. *See In re Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975). Despite her limited income, she spoke with her mother and sister once a month concerning Melissa's progress and welfare. In addition, letters were exchanged bi-weekly and Barbara P. testified the only purpose was the transmittal of requested information about and pictures of the child. This reliance on the part of appellant was eminently reasonable in view of her circumstances and the regularity with which the mother and sister visited Melissa and the obvious interest in her welfare which they shared. More importantly, it is apparent from Barbara P.'s testimony that she considered herself functioning, at least partially, on her sister's behalf.[10] She testified that when she took gifts to Melissa she often said they were from her "mom-

10. Mrs. P., appellant's mother, did not testify at the involuntary termination hearing due to illness.

my." She also communicated to Melissa the fact that her mommy missed her and loved her.[11]

In summary, as we viewed the record it depicts a mother whose child was taken from her custody involuntarily because of the environment in which the family was living at the time. Throughout the entire time the child was separated from the mother, the mother continued unceasingly to change that environment and to make it adaptable to the raising of her offspring including making arrangements to live separate and apart from her husband who was the primary cause for the original removal of the child from the household. Furthermore, even though she was living separately and apart from the child she continued to maintain communication with that child albeit through the use of surrogates. Under these circumstances we believe that the lower court erred in finding that the appellant had refused or failed to perform her parental duties during the designated six-month period.

Decree of the court below is reversed and the petition for involuntary termination is dismissed.

JONES, Former C. J., and POMEROY, J., did not participate in the decision of this case.

ROBERTS, J., filed a dissenting opinion in which EAGEN, C. J., joins.

Each party to bear own costs.

ROBERTS, Justice, dissenting.

The Orphans' Court Division of the Chester County Court of Common Pleas determined that appellant, Patricia D., failed to perform parental duties for a period in excess of six

11. The court did not discuss Barbara P.'s testimony regarding what she said to Melissa but found that the mother's interest in the grandmother's and aunt's visits was never communicated to the agency. We do not believe that this fact, if true, is determinative of whether Mrs. P. and Barbara P. were acting on appellant's behalf. It is of primary importance that appellant's interest in Melissa was transmitted to the child herself and there is no requirement in our caselaw or in the applicable statute that communications with a child be made *exclusively* through the agency.

months. Pursuant to section 311(1) of the Adoption Act,[1] the court ordered termination of her parental rights. The majority reverses the decree of the orphans' court. In reaching this result, the majority misreads the record and adopts an erroneous view of the standard of parental responsibility required by the Adoption Act. I dissent.

Melissa P. was last in the physical custody of appellant, her natural mother, on September 13, 1974. Melissa, then ten months old, was hospitalized on that date as a result of severe physical abuse. On September 20, 1974, the Court of Common Pleas of Chester County granted temporary custody of Melissa to appellee, Chester County Children's Services. On October 1, 1974, pursuant to juvenile proceedings,[2] the court of common pleas found by clear and convincing evidence that Melissa had been physically abused and assaulted in August, 1974, by her stepfather, Roland D. The court also found that in September, 1974, while in the custody of appellant and her husband, Melissa was further abused and assaulted, resulting in her hospitalization. Based on these findings, the court determined that Melissa was a deprived child within the meaning of the Juvenile Act,[3] and continued her custody with Children's Services. At a dispositional hearing held January 30, 1975, custody was again continued with Children's Services, with a review ordered to take place in six months, upon request of any party. No request for review of this order has been made.

In late September, 1974, while the juvenile proceedings were in process, Mrs. D. moved to Ohio with her husband, Melissa's stepfather. After appellant moved to Ohio, her contacts with Melissa and Children's Services were minimal, consisting of one visit with Melissa in January, 1975, and

1. Act of July 24, 1970, P.L. 620, § 311(1), 1 P.S. § 311(1) (Supp.1977).

2. See Act of December 6, 1972, P.L. 1464, §§ 1 et seq., 11 P.S. §§ 50–101 et seq. (1977).

3. The Juvenile Act defines a "deprived child" as one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals . . . ." Id. § 50–102(4)(i).

two letters to the agency, dated November 10, 1974, and March 29, 1975.[4] Upon appellant's request, Chester County Children's Services contacted an Ohio children's services agency, which investigated appellant's home in Ohio and initiated counseling for appellant and her husband. The counseling, however, was unsuccessful and was discontinued in February, 1975, at which time the Ohio agency concluded that Melissa should not be returned to the custody of appellant.

In November, 1975, more than a year after Melissa was placed in foster care, and more than seven months after appellant's last communication with Chester County Children's Services, the agency petitioned to terminate appellant's parental rights pursuant to section 311(1) and (2) of the Adoption Act,[5] in order that Melissa might be placed for adoption. The Orphans' Court Division of the Chester County Court of Common Pleas sustained the petition under section 311(1).[6]

The majority reverses the orphans' court decree, holding that there is insufficient evidence to support a finding that appellant has failed to perform parental duties for the requisite six month period.[7] I cannot agree. Although it purports to accept the findings of fact of the orphans' court,

4. Appellant testified that, in addition to the two letters and her single visit, she attempted unsuccessfully to contact Children's Services by telephone twice in January, 1975. She recalled that Melissa's caseworker was out when the first call was made; she could not remember why the second call did not get through. Apparently, appellant gave up trying to call when these two efforts were unsuccessful.

5. 1 P.S. § 311(1), (2) (Supp.1977).

6. Section 311(1) provides that parental rights may be terminated when:

"The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . . ."
Id.

7. The majority also concludes that the evidence is insufficient to sustain a termination of parental rights on the grounds provided in section 311(2) that:

the majority substitutes its own findings which are not supported by the record. The majority also accepts a standard of performance of parental duties which consists of

"The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent . . . ."

Id. § 311(2). I believe a close question is presented whether grounds exist under section 311(2). Although the evidence suggests that appellant's husband, rather than appellant, abused Melissa, it also indicates that appellant felt herself incapable of preventing this abuse and protected her husband by denying that he was responsible for the abuse. A witness, with whom appellant and her family had been living, testified to one incident in which appellant's husband kicked Melissa eighteen inches off the floor. Appellant was upset by the occurrence, but told the witness that "there is nothing she could do when something like this happened." Shortly after this incident, the witness observed Mr. D. hit Melissa with a rubber mallet and ordered him to move out of her house. Appellant remained with Melissa at the witness' house for a short period, but later rejoined her husband. Approximately a week after appellant rejoined her husband, Melissa was admitted to the hospital as a result of extensive further abuse.

The majority states that appellant attempted to remedy this situation by encouraging her husband to enter counseling with the Ohio children's agency. However, the attempts at counseling were complete failures because appellant and her husband obstinately denied any knowledge of or responsibility for the abuse suffered by Melissa. There was clear medical evidence and credible testimony regarding the abuse of Melissa. Appellant's refusal to acknowledge this problem cannot reasonably be characterized as reflecting a sincere effort to remedy the situation.

Finally, the majority notes that appellant has completely removed the danger of abuse by separating from her husband and moving in with her sister. However, the sincerity of appellant's statement of her intention to separate from her husband might reasonably be questioned. Appellant stated for the first time that she intended to live apart from her husband at the termination hearing. Two weeks before the hearing, she advised the court that her address was in Ohio. Nothing in the record indicates that this hastily conceived plan to separate from her husband was based on a recognition that appellant's husband was a threat to Melissa's safety. Both of appellant's letters to Children's Services expressed her desire that Melissa be returned to both herself and her husband, and related that her husband shared this wish. Appellant steadfastly denied to the Ohio counselor that her husband had ever abused or mistreated Melissa. Despite the fact that it made visitation with Melissa extremely difficult, appellant remained with her husband in Ohio for over a year prior to the hearing, even though he lost his Ohio job a month after

little more than sporadic expressions of interest in one's child. Finally, the majority espouses a view that a parent may abdicate parental duties and yet preserve his or her parental rights as long as "surrogates" are willing to maintain a relationship with the child.

The purpose of involuntary termination of parental rights is to permit a child whose parent has failed, by choice or neglect, to meet the child's continuing needs for parental care and affection to establish a new parent-child relationship through adoption. *In re: Male Infant B.E.*, 474 Pa. 139, ——, 377 A.2d 153, 156 (1977). This purpose is frustrated by the decision of the majority. The decree of the orphans' court is supported by competent evidence and should not be disturbed.

We have often held that it is a parent's affirmative duty to provide his or her child with love, protection, guidance, and support. E. g, *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.*, 474 Pa. 615, at ——, 379 A.2d 535, at 540 (1977); *Matter of Kapcsos*, 468 Pa. 50, 360 A.2d 174 (1976) (plurality opinion); *Adoption of McCray*, 460

they moved. While in Ohio, appellant had a child by her husband, and was expecting another at the time of the hearing.

Against this evidence of appellant's loyalty and devotion to her husband, her only explanation for the decision to leave him was that "we have had a lot of financial difficulties out in Ohio." This problem had existed ever since appellant's husband lost his job. Appellant did not indicate why, within two weeks of the termination hearing, she first decided that it warranted separation from her husband. Nor did appellant indicate why her unemployed husband would not return to Chester County to be with her and Melissa, or why she would not rejoin her husband should the financial problems be resolved. These factors are not intended to imply that appellant had an obligation to leave her husband in order to regain custody of her child. Rather, they are intended to point out that the majority's conclusion that the abuse problem no longer exists because appellant intends to remain apart from her husband rests on a question of fact which the court, on this record, could reasonably have resolved against appellant.

Nonetheless, the orphans' court appeared to credit appellant's testimony that she intended to separate from her husband, and her testimony may be sufficient to support this finding. Because I conclude there is sufficient evidence to support termination under section 311(1), it is unnecessary to decide whether termination would also be justified under section 311(2).

Pa. 210, 331 A.2d 652 (1975). Although a parent may not have custody of a child, he or she must still make a substantial effort to maintain communication and association with the child. E. g., *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra; *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974). Section 311(1) of the Adoption Act reflects a legislative judgment that when a parent has allowed the parent-child relationship to deteriorate to the child's substantial detriment, and the possibility exists for the child to establish an effective parent-child relationship through adoption, the parent-child relationship may be terminated. See *Male Infant B.E.,* supra 474 Pa. at ——, 377 A.2d at 156.[8]

I

In holding that appellant has not failed to perform parental duties for the requisite six month period, the majority

**8.** Some confusion appears to exist as to the relationship between the welfare, or "best interests," of a child and the decision whether to terminate parental rights. See Placey, "Effect of the Adoption Act of 1970 on Termination of Parental Rights," 81 Dickinson L.Rev. 709 (1977). Clearly, section 311(1) is intended to further the interests of a child by enabling the child to establish a new parental relationship through adoption when the child's parent or parents have, through choice or neglect, failed to perform parental duties for at least six months. However, under section 311(1), facts justifying termination of parental rights must be established without regard to the child's best interests, *Adoption of R.I.,* 468 Pa. 294, 361 A.2d 294 (1976); *Adoption of McAhren,* 460 Pa. 63, 331 A.2d 419 (1975); *Sheaffer Appeal,* 452 Pa. 165, 305 A.2d 36 (1973), and termination will not be ordered if the parent has utilized all resources available to maintain the parent-child relationship. *In re: Involuntary Termination of Parental Rights of S.C.B and K.T.,* 474 Pa. 615, at ——, 379 A.2d 535, at 540 (1977); *Adoption of Croissette,* 468 Pa. 417, 364 A.2d 263 (1976).

Once grounds for termination have been found under section 311(1), the welfare of the child will be considered in determining whether parental rights should be terminated. *Adoption of R.I.,* supra 468 Pa. at 299 n. 12, 361 A.2d at 300 n. 12; *Battle Adoption Case,* 456 Pa. 553, 558, 321 A.2d 622, 624 (1974); *Weinbach's Appeal,* 316 Pa. 333, 339, 175 A. 500, 502 (1934). Here appellant does not contend that, even if the orphans' court's determination that she has failed to perform parental duties for the statutory six month period is sustained, the best interests of Melissa would be served by denying termination of appellant's parental rights.

rejects findings of the orphans' court which are amply supported in the record, and relies upon its own findings which, upon examination, are either irrelevant or unfounded. This violates our settled principle that "[t]he adjudication of the orphans' court will not be disturbed if . . . 'the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence.' " *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra, 474 Pa. at ——, 379 A.2d at 540, quoting *Cohen Will,* 445 Pa. 549, 550, 284 A.2d 754, 755 (1971).

The majority attributes importance to appellant's three trips from Ohio in September, 1974, to attend juvenile hearings concerning Melissa's custody. Even assuming these trips reflected an "expression of her love, concern and interest for the child's well-being," as the majority asserts,[9] they all took place more than a year before the present petition was filed. Past demonstrations of affection and concern may be relevant to a determination whether a parent had a "settled purpose" to relinquish parental claims to a child, but parental rights may be terminated upon a failure to perform parental duties, despite a subjective desire by the parent to maintain the parent-child relationship. *In re: Involuntary Termination of Parental Rights of S.C.B and K.T.,* supra; *Adoption of Croissette,* 468 Pa. 417, 364 A.2d 263 (1976); *In re: Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1976); *Adoption of McCray,* supra. The statute prescribes that parental rights may be forfeited by failure to

9. The majority concedes that appellant did not visit with Melissa during any of these trips. Counseling was offered to appellant and her husband at this time, which appellant refused on the advice of her attorney. Children's Services arranged for appellant and her husband to visit Melissa on September 25, 1974, and, when appellant and her husband did not appear, on September 26. Appellant testified that she could not make the September 25 visit because she was travelling, and that she did not know of the September 26 visitation arrangement, although the arrangements were made in cooperation with appellant's attorney. Neither appellant nor her attorney informed Children's Services that appellant would be unable to visit on these dates, and Melissa was brought to the Children's Services office on both days.

perform parental duties for a period of six months. If the statutory time limit is not to be ignored, appellant's trips to the juvenile hearings in September, 1974, can be afforded little, if any, relevance to the question whether she subsequently failed to perform parental duties, justifying termination of her parental rights under section 311(1).[10]

The majority's major reliance is on its characterization of appellant's relationship with the Ohio children's services agency during the time Melissa was in foster care. The majority would excuse appellant's failure to maintain any reasonable degree of contact with Melissa or Chester County Children's Services because "during most of this time [appellant was] working with the Ohio agency." However, a letter from the Ohio agency to Chester County Children's Services, which was admitted into evidence without objection, reveals this characterization of the record to be naive, if not disingenuous.

According to the Ohio counselor, the attitude of appellant and her husband was that if they would "put in time" with a counselor, Melissa would be returned. Both denied that either had ever abused Melissa. As to the injuries for which Melissa had been hospitalized, appellant and her husband blamed appellant's sister (whom appellant now lives with

10. Section 311(1) provides unambiguously that, without regard to past conduct, a parent's failure to perform parental duties for more than six months may justify termination of that parent's rights to his or her child, and the majority should not undercut that legislative policy because it thinks a longer period more appropriate. Recognizing that section 311(1) is intended to further the interests of children who, as a result of parental choice or abdication of responsibility, are without an effective parent-child relationship, see note 7, supra, the six month limit is not unreasonable. Although six months may seem a relatively short period to an adult, children have a substantially different sense of time; to a child, six months without an effective parent-child relationship is an extremely long time. See J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interest of the Child 40–49 (1973); Wald, "State Intervention on Behalf of 'Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights," 28 Stan.L.Rev. 623, 695 n. 279 and accompanying text (1976) (consensus of surveyed child development experts that six months is the maximum amount of time children under three can retain attachments to an absent parent).

and upon whom she relied as her "surrogate" in performing parental duties), saying the injuries occurred when appellant's sister took Melissa for a walk. The Ohio agency submitted medical evidence to an independent local physician who concluded, consistent with the findings of the Chester County Court of Common Pleas, that the marks and bruises could not have resulted from a fall or play, and could not have occurred on one day. Even when confronted with this independent medical opinion, appellant and her husband adhered to their earlier claims that they were not responsible and that they had no knowledge of any marks or bruises on Melissa before she was hospitalized. After three sessions with appellant and her husband, the Ohio counselor discontinued the counseling, concluding that the attitude of appellant and appellant's husband prevented her from providing any meaningful assistance.[11]

The last counseling session took place on February 18, 1975, exactly nine months before the filing of the termination petition. The Ohio agency reasonably concluded that appellant was protecting either herself or her husband by denying that either of them had ever abused Melissa, and advised Chester County Children's Services of its view that Melissa's life would be in danger if she were then returned to appellant's custody. At the last session, the Ohio counselor advised appellant that she felt the counseling had been unsuccessful and could not proceed as long as the problem was not recognized by appellant. She did offer to counsel appellant and her husband if, in the future, either of them

11. In her brief, appellant argues that the Ohio counseling failed because appellant was asked to admit falsely that she had personally abused Melissa. This argument has no support in the record. It is clear from the Ohio agency's letter that the counselor's concern was that appellant would not admit that *any* abuse had occurred, by herself or her husband. Appellant's protestations in this regard were wholly contradicted by medical evidence, examined by an independent local physician in Ohio as well as physicians in Chester County, and the findings of the Chester County Court of Common Pleas in the Juvenile proceedings. Moreover, testimony at the termination hearing, credited by the court, established that appellant witnessed at least one incident of abuse of Melissa by her husband and said there was nothing she could do about such things when they occurred. See note 4, supra.

came to her and asked for assistance with problems which may have led to the abuse. In a letter dated May 5, 1975, Chester County Children's Services referred to the failure of the Ohio counseling and recommended that, if appellant could not return to Chester County and work with Children's Services there, she renew her contacts with the Ohio agency and seek further help in making the changes necessary to permit Melissa to be returned safely to her custody. Appellant never requested any further assistance from the Ohio agency.

Thus the conclusion of the majority that appellant was working "unceasingly" to change her environment and adapt it to the needs of Melissa is wholly unsupported by the record.[12] Similarly, the majority's assertion that appellant was relying on the instructions of Children's Services and was "reasonably led to believe that [cooperation with the Ohio agency] would preserve her rights to her child" is devoid of support in the record, in light of the uncontradicted evidence that appellant was advised by both the Ohio and the Chester County agencies that the counseling had failed, and that further efforts on appellant's part would be necessary before Melissa could be returned.[13]

12. The majority also mischaracterizes the unannounced home visits by the Ohio agency, which continued through August, 1975, as part of a rehabilitative plan aimed at establishing conditions which would enable Melissa to return to appellant's custody. The letter from the Ohio agency reveals that the home visits were not part of a plan established with appellant to permit Melissa to be returned, but were made because the Ohio agency was concerned for the safety of appellant's other infant child, who was born shortly after appellant moved to Ohio. After the initial attempt at counseling ended unsuccessfully in February, 1975, both the Ohio and the Chester County agencies informed appellant that Melissa would not be returned until appellant recognized the abuse problem and took steps to deal with it.

13. It may be that appellant believed, as the Ohio counselor put it, that she need only "put in time" with the counselor in order to have Melissa returned. However, such an attitude does not bespeak a responsible effort to meet Melissa's need for a safe and secure home, and deserves no approval from this Court.

Foster care programs have been criticized for failing to involve parents in plans for reuniting families and, in some instances, dis-

The majority also finds, contrary to the conclusion of the orphans' court, that appellant maintained communication with Melissa through appellant's mother and sister, both of whom visited Melissa monthly while she was in foster care. The majority states that it is "abundantly clear" from appellant's testimony that she relied upon her mother and sister to perform parental duties in her absence, and relates as uncontradicted fact that appellant corresponded with her mother and sister bi-weekly and spoke to them by telephone once a month concerning Melissa's progress and welfare. The orphans' court, however, did not credit this testimony and expressly concluded that appellant had not attempted to fulfill her parental obligations through the activities of the sister and grandmother. I cannot agree with the majority that the orphans' court erred in refusing to credit appellant's

couraging parents from maintaining close communication with a child in foster care. This unfortunate practice may occur because it is administratively more convenient, because resources for assisting parents are limited, and, it has been suggested, because of an unconscious bias on the part of caseworkers against the lifestyles and home conditions of the poor. See *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 834, 97 S.Ct. 2094, 2105, 53 L.Ed.2d 14 (1977); Wald, supra, 28 Stan.L.Rev. at 676–79; Wald, "State Intervention on Behalf of 'Neglected' Children: A Search for Realistic Standards," 27 Stan.L.Rev. 985, 998 (1975); Levine, "Caveat Parens: A Demystification of the Child Protection System," 35 U.Pitt.L.Rev. 1, 16, 21 (1973).

Here, however, the record does not support a finding that appellant was discouraged by either the Ohio or Chester County agencies from maintaining her relationship with Melissa, or from taking steps to secure Melissa's safe return. Chester County Children's Services offered to provide appellant with counseling shortly after Melissa was hospitalized. When appellant wrote Children's Services, after having moved to Ohio, of her desire to regain custody of Melissa, Children's Services contacted the Ohio agency on her behalf. The Ohio agency initiated counseling for appellant, which was discontinued only when appellant refused repeatedly to acknowledge the existence of an abuse problem in her home. The Ohio counselor offered to resume the counseling if appellant or her husband requested it. After learning of the failure of the Ohio counseling, Children's Services wrote to appellant, recommending that she either return to Chester County to work with that agency on a plan to regain custody, or resume counseling with the Ohio agency. The record indicates that Children's Services acted in good faith to involve appellant in efforts to develop a plan for Melissa's safe return to her custody.

claim that her mother and sister were acting on her behalf in visiting Melissa.[14]

## II

Moreover, even assuming that appellant maintained regular communication with her mother and sister concerning Melissa's welfare, this activity would not be sufficient to satisfy appellant's affirmative parental duties. We faced a similar situation in *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra. There, the mother of the children in question failed to communicate with her children or the children's services agency for a ten month period while the children were in foster care. She argued, however, that she had kept constantly informed as to the children's welfare through a friend who regularly visited the foster home. Although, unlike here, the mother's testimony was credited as to these communications, we concluded that:

"Appellant's passive interest in [the children's] well being did not satisfy the children's continuing needs for responsible parental care. Her conduct did not satisfy her

**14.** The majority bases its conclusion on the testimony of appellant and her sister that they frequently communicated concerning Melissa. Several factors appear in the record, however, which support the orphans' court's conclusion that this testimony should not be credited. Although appellant carefully preserved copies of all her communications with the agency, neither she nor her sister introduced any of the letters allegedly exchanged bi-weekly over a thirteen month period. Appellant advised the orphans' court that her mother, who presumably could have corroborated her testimony, was ill and unable to appear. However, appellant made no request for either a continuance to permit her mother to testify, or leave to introduce by affidavit or otherwise a corroborative statement from her mother. Appellant's sister had a strong personal motive to support appellant's testimony. The sister had developed close personal ties to Melissa while the child was in foster care, and had expressed a desire to obtain custody of Melissa if the child was not returned to appellant. This hope was discouraged by the agency. In her testimony, the sister revealed her concern that "if they give her out for adoption I will never see her again . . . ." Although the sister admitted often discussing Melissa with Children's Services personnel during her monthly visits, she did not explain why she had never mentioned to them any of the alleged communications with appellant concerning the child.

affirmative duty to utilize all available resources to preserve her parental rights."

474 Pa. at ——, 379 A.2d at 540.

In my view, the majority seriously errs in espousing a "surrogate concept" under which passive expressions of concern are sufficient to preserve parental rights, so long as relatives or agencies are willing to meet the child's continuing needs in the parent's absence. A parent cannot simply abdicate parental responsibility to others and thereby preserve her parental rights. As we stated in *Smith Adoption Case,* 412 Pa. 501, 505, 194 A.2d 919, 922 (1963): "Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with her immediate and continuing physical and emotional needs)." We have noted that parental duties are best understood in relation to the needs of a child. *Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra, 474 Pa. at ——, 379 A.2d at 540. A child's need for parental love and affection cannot be delegated to "surrogates." Rather, to meet this essential emotional need:

" '[A parent] must exert himself to take and maintain a place of importance in the child's life, and must exercise reasonable firmness in declining to yield to obstacles. Otherwise, he cannot perform the job of parent, and the parent-child relationship will deteriorate . . . .' "

*Appeal of Diane B.,* supra 456 Pa. at 433, 321 A.2d at 620, quoting *In re: Adoption of J.R.F.,* 27 Somerset L.J. 298, 304–05 (Pa.C.P.1972).

Parental duties are not met if the parent does no more than "express in a positive manner her affection for the offspring and her interest in maintaining the parental relationship," particularly when the effect of such minimal efforts is to leave the child indefinitely in the "limbo" of foster care. See Mnookin, "Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy," 39(3) Law

and Contemp.Probs. 226, 273 (1975). Although a parent may make reasonable arrangements for the temporary care of the child, *Wolfe Adoption Case,* 454 Pa. 550, 557, 312 A.2d 793, 796–97 (1973), I agree with the reservation expressed by former Chief Justice Jones, writing for the Court, in *Chester County Children's Services Appeal,* 457 Pa. 525, 528, 326 A.2d 377, 379 (1974): "[T]here is serious question whether the placing of a child with a public welfare agency should be considered as the type of arrangement which would preserve a parent's claim to the child." There can be little doubt that foster care placement, intended only as a temporary measure, cannot meet a child's long term needs for a stable home and an effective parent-child relationship.[15] Consequently, a parent whose child has been placed in foster care, for whatever reason, has an affirmative parental duty to work towards the eventual return of the child. Mere expressions of interest in the child and of a desire to eventually be reunited with the child, unaccompanied by affirmative steps to bring that result about, are insufficient to preserve parental rights. See *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra; *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974); *Chester County Children's Services Appeal,* supra. Section 311(1) does not allow that a parent, at the emotional expense of the child, may "merely [wait] for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities . . . ." *Smith Adoption Case,* 412 Pa. at 505, 194 A.2d at 922.

## III

Here, the orphans' court correctly concluded that appellant had failed to perform parental duties for a period in excess of six months, justifying termination of appellant's parental rights under section 311(1) of the Adoption Act. While Melissa lingered in foster care for over a year before the termination petition was filed, appellant visited her only

15. For general discussion of the many problems involved in current foster care practices, see *Smith v. Organization of Foster Families for Equality and Reform,* supra.

once, and wrote the agency only two letters, the last nine months prior to the petition, concerning her desire that Melissa be returned. Contrary to the majority's assertion that appellant was working continuously with the Ohio agency to secure Melissa's return, the record is clear that appellant was advised in February, 1975, eight months before the termination petition was filed, that the agency could not recommend Melissa's return until appellant faced up to the abuse problem and took affirmative steps to deal with it. This same information was conveyed to appellant by letter from Chester County Children's Services in May, 1975, which recommended that appellant either return to Chester County or make a new effort to work with the Ohio agency. The record does not indicate that appellant made any further effort to seek assistance in creating an environment suitable for Melissa's return after the counseling ended unsuccessfully. Although appellant did not attend the January, 1975, juvenile proceedings which continued Melissa's custody with Children's Services, she was advised by the agency and, presumably, her attorney, that the custody order could be reviewed in six months upon her request. Appellant never sought review. In these circumstances, I cannot conclude that appellant utilized all available resources to preserve the parental relationship. See *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.,* supra; *Adoption of McCray,* supra; *Appeal of Diane B.,* supra.

The decree of the orphans' court is supported by competent evidence. The decree granting the petition to terminate appellant's parental rights should be affirmed.

The purpose of section 311(1) is to allow a child, like Melissa, whose continuing needs for parental care and affection have not been met, to establish a new parent-child relationship through adoption. The majority denies Melissa that opportunity. I dissent.

EAGEN, C. J., joins in this dissenting opinion.