424 A.2d 1280

**In re Adoption of M. M., A Minor.**

**Appeal of J.M. and C.B.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1980.

Decided Feb. 4, 1981.

Frank J. Bolock, Jr., Scranton, for appellant.

George Houck, Scranton, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

NIX, Justice.

This is an appeal from a final order of the Orphans' Court Division of the Court of Common Pleas of Lackawanna County terminating the parental rights of appellants, J. M. and C. B., with respect to their daughter, M. M. The instant case raises the question of whether the inability to provide proper support for an infant due to poverty falls within the language of Section 311(1) or (2) of the Adoption Act, Act of July 24, 1970, P.L. 620, Section 311(1), (2), 1 P.S. Section 311(1), (2) (Supp.1980–81).

Appellants, J. M. and C. B. are the natural parents of M. M., born September 4, 1977. The child was taken by the Lackawanna County Bureau of Childrens Services on or about September 13, 1977 and has since resided in foster care.

The Lackawanna County Bureau of Childrens Services (hereinafter B.C.S.) became involved with M. M. on September 12, 1977 when she was eight days old. Nancy Johnson, a caseworker for the B.C.S., testified that she received a complaint from the Childline in Harrisburg indicating that a child had gone home to live with the mother and the mother was not capable of providing care, that she had no proper

supplies or provisions and was living in unfit conditions. In response to this complaint, Ms. Johnson appeared at appellants' home during the night of September 12, 1977. The mother, who appeared very frightened refused to admit the caseworker.

Ms. Johnson returned to appellants' home later that night with a Scranton police officer. Ms. Johnson made an inspection of the premises and decided to request temporary custody of the baby because she was of the opinion that the child's parents did not have the proper supports needed. The caseworker seized the child from the home and placed her with the B.C.S.

■ Our scope of review is limited to determining whether the court's decree is supported by competent evidence. *In Re Adoption of Baby Boy P.*, 479 Pa. 138, 387 A.2d 873 (1978); *In Re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978). The adjudication of the Orphans' Court will not be disturbed if "the record is free from legal error and ... if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence." *In Re Burns*, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977); *Cohen Will*, 445 Pa. 549, 550, 284 A.2d 754, 755 (1971).

■ The record in the instant case does not support the determination of the Orphans' Court that the parents evidenced a settled purpose of relinquishing their parental claim, that they refused to perform their parental duties or that the conditions will not be remedied by the parents.

Section 311(1) provides:

> The rights of a parent in regard to a child may be terminated..., on the ground that: (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

Under this provision, it must be established by a preponderance of the evidence that for a period of at least six months

appellants either evidenced a settled purpose of relinquishing their parental claim or that they have refused or failed to perform their parental duties. *Adoption of Farabelli*, 460 Pa. 423, 383 A.2d 846 (1975). The question of whether a parent has evidenced a settled purpose of relinquishing parental claim to a child must be analyzed in relation to the particular circumstances of the case. *In re D. J. Y.*, 487 Pa. 125, 408 A.2d 1387 (1979); *In Re Burns, supra.*

In the instant case appellants have not evidenced a settled purpose of relinquishing their parental claim. M. M. was taken by the B.C.S. on September 12, 1977. Realistically, the release of M. M. to the B.C.S. cannot be considered voluntary. The mother evidenced her wish not to be disturbed by her initial refusal to admit Ms. Johnson. Admission was gained only after Ms. Johnson arrived escorted by a police officer thereby suggesting some official authority for the request. Clearly, coercive aspects of the initial entry are evident. To suggest that these facts constituted a voluntary surrender of custody by the natural mother would strain credulity.

Two days after M. M. was taken from her parents on September 14, 1977 Richard Powell, another caseworker with the B.C.S., visited the parents and requested consent for custody of the child. The mother was told that if she refused voluntary custody she would be required to face court action. Again, it was obvious that the threat of the authority of the State was the motivating factor in causing the parents to decline to resist the wishes of the agency. We are not unmindful of the added fear engendered in the deprived and defenseless by a display of authority.

The testimony of Mr. Powell clearly demonstrated the interest and concern of the mother and her expressed desire to have the child returned to the family. He testified that both parents had visited with the baby and repeatedly informed him of their attempts to satisfy the requirements for the return of their child. Between September 14, 1977 and December 12, 1977, out of nine contacts between the B.C.S. and the parents, six were initiated by the parents.

Obviously these contacts reflect an intense interest in both the welfare of the child and in becoming reunited with the infant.

The testimony of Paula Friedman, yet another caseworker, further supports the keen interest of the parents in the welfare of the child. Ms. Friedman testified that there were at least thirteen contacts between the caseworker and the parents, of which four were initiated by the parents. At the mother's request, the parents visited with the baby on three occasions. During this period, the parents again attempted to satisfy the "goals" established by the B.C.S.

On January 1, 1979 Barbara Manley, a fourth caseworker, assumed responsibility for handling the case of M. M. From January 1, 1979 until May 1979, when the B.C.S. refused to allow visitation of the infant and decided to file a petition for the involuntary termination of the parents' rights, the parents repeatedly asked for the return of their child and persisted in their efforts to satisfy the B.C.S.'s requirements. During this period there were six contacts between the parents and the caseworker. The parents initiated four of these contacts.

Judge Penetar states in his opinion that "(t)he evidence in this case overwhelmingly shows that J. M., mother, never consistently demonstrated parental love, protection and concern," and "(i)n this case, we find that C. B. has evidenced a settled purpose of relinquishing parental claim, and has refused or failed to perform parental duties."

█ We find, in reviewing the record, that appellants were most concerned about the welfare of their child, and in fact were affirmatively taking steps to have her returned. Nowhere in the record was it shown that appellants evidenced an "affirmative indication of a positive intent" to sever parental relations. *Adoption of McAhren*, 460 Pa. 63, 70, 331 A.2d 419, 423 (1975); *Sheaffer Appeal*, 452 Pa. 165, 170, 305 A.2d 36, 38 (1973). On the contrary, the parents repeatedly contacted the agency seeking the return of their daughter. The record shows there were ten contacts be-

tween the father and the caseworkers throughout this period. Two of these contacts were initiated by the father to inform the agency that certain goals had been satisfied. The mother had seventeen contacts with the agency during the same period. It is well established that in view of the irreversible nature and serious emotional impact of the involuntary termination of parental rights, such action is not authorized unless a preponderance of the evidence clearly warrants it. *Adoption of McAhren, supra.*

The record is equally inadequate to support the theory that appellants failed or refused to provide parental care during the statutory period. This portion of Section 311(1) requires that a parent exert himself to take and maintain a place of importance in the child's life. As a corollary, we have required that a parent affirmatively demonstrate his love, protection and support of his child and to make every reasonable effort to maintain communication and association with that child. *Adoption of Farabelli, supra; Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975). In the instant case, in addition to the frequent contacts and visits by the parents, there were several attempts by them to satisfy the requirements imposed by the B.C.S. On November 12, 1977, the father informed Mr. Powell that one of the goals had been satisfied. Upon being informed that more had to be done before the child would be returned, the parents moved into another apartment, bought a crib and birthday present for their baby. Efforts on the part of the parents to obtain another apartment, a crib and a birthday present indicate a willingness to provide a supportive environment for the infant within their ability to economically support their baby. Under the existing circumstances, the record establishes appellants' love and affection for their child and their actions fully comport with the requirement that they affirmatively demonstrate that affection.

Further, the parents repeatedly attempted to satisfy the B.C.S.'s "goals" and to remedy the situation, as required by Section 311(2).

Section 311(2) provides that the rights of parents may be terminated where:

The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent;....

On September 7, 1978, Ms. Friedman was notified by the parents that they had moved and that they had a crib and birthday gift for the baby. When the caseworker finally contacted appellants on October 5, 1978, the parents requested custody of M. M. or weekend visits. They were told this could not be done. Despite their improvement and the fact that they had remedied the situation, the B.C.S. still refused the parents' request to allow extended visitation or custody. Ms. Friedman testified that after this meeting she did not contact the parents because she and her supervisor had decided to file an involuntary termination petition.

The only basis for suggesting the incapacity of the natural parents in the case is their limited economic potential. We find nothing in the Adoption Act that would suggest a legislative intention to deprive the natural parents of the experience of childhood solely on the basis of their impecunious situation. Absent the showing that the parents' financial situation was self inflicted, there is no basis for state intervention in such a sacred personal relationship.

In summary, the repeated efforts and requests of the parents for the return of their baby vitiates any possible conclusion that they intended to relinquish their parental rights.

The conduct of the B.C.S. was shocking. The infant was only eight days old when removed and all subsequent efforts made by the parents to see their child were deliberately and successfully thwarted by the B.C.S. To interpret this factual setting as comprising the intent to relinquish parental rights would be a travesty. Nor can it be said that there was an affirmative failure of the parents to support the infant. The totality of the circumstances establish that the parents wanted to remain a positive force in their baby's

life, but were thwarted in their efforts. *In Re D. J. Y.,
supra,* 487 Pa. at 131, 408 A.2d at 1390, *Adoption of S. H.,*
476 Pa. 608, 610, 383 A.2d 529, 530 (1978).

While the parents were exceedingly poor, there is no
evidence indicating a lack of love, desire for and responsibili-
ty to the infant. Nor was there any evidence to suggest
their financial situation was of their own making.

Accordingly, the decree involuntarily terminated the pa-
rental rights of J. M. and C. B. is hereby reversed.

FLAHERTY, J., filed a concurring opinion.

O'BRIEN, C. J., and ROBERTS, J., concurred in the
result.

FLAHERTY, Justice, concurring.

I join in the majority opinion. History would have taken
a different course had Jesus Christ been born in Lackawan-
na County.