450 A.2d 1356

**In the Matter of the ADOPTION OF Larry Lee BARNETT.**

**Appeal of Alice WAITE.**

Superior Court of Pennsylvania.

Submitted April 28, 1982.

Filed Sept. 17, 1982.

William Dubose Taggart, Erie, for appellant.

James E. Beveridge, Erie, for participating party.

Before CERCONE, President Judge, and BECK and MONTEMURO, JJ.

CERCONE, President Judge:

Appellant, Alice Waite, takes this appeal from the Judgment of the court below terminating appellant's parental rights to her son, Larry Lee Barnett, now four-years-old.[1] Appellant argues that appellee, Children's Services of Erie County, failed in the court below to meet its burden of proof. We agree and we reverse.

These are the facts adduced before the court. On November 18, 1977, appellant, then fourteen years old and in seventh grade, gave birth to a son, Larry, now the subject of this appeal. During the first year of Larry's life, appellant

1. The parental rights of the child's natural father, Larry Barnett, Sr., were terminated by court order on October 9, 1980. The petition to terminate the father's rights was filed on the same date as was the petition to terminate appellant's rights, that is, on July 22, 1980, however, the hearings on the two petitions were conducted separately. The only witness appearing at the hearing on the petition was a caseworker from Children's Services, Georgeann Setcavage. According to her testimony, there had been entered a court order on an unspecified date directing the father to pay $25.00 per week in child support. After this hearing, the father's parental rights were terminated and he has not appealed from this order. We note for completeness, however, that the involuntary termination of the father's parental rights does not necessarily end his obligation to pay child support. Although the issue has not yet been decided in the context of an involuntary termination, in *Commonwealth, Dept. of Public Welfare ex rel. Hager v. Woolf,* 276 Pa. Superior Ct. 433, 419 A.2d 535 (1980), we ruled that a voluntary relinquishment of parental rights does not end the obligation to pay child support, absent the subsequent adoption of the child by another. The *Hager* case was decided under The Adoption Act of July 24, 1970, P.L. 620, §§ 311 et seq., 1 P.S. §§ 311 et seq.

However, the new act specifically directs that a decree terminating parental rights will also terminate the obligation of support. The Act of 1980, Oct. 15, P.L. 934, No. 163 § 1 (Supp.1982). Nevertheless, the instant case proceeded under the earlier version of the law, *see* The Adoption Act of July 24, 1970, P.L. 620, Section 313, 1 P.S. § 313, so the status of the support order for Larry is not settled.

cared for the child while living at home with her own parents, Charles and Dorothy Waite. During this time, Children's Services was not involved in any way with the Waite family. Then, in November of 1978, the Commonwealth, acting in parens patriae, found Alice to be a truant from school; she was found delinquent and sent to Waynesburg Juvenile facility. The baby was left in the custody of Alice's parents, apparently by court order.

Five months later, on March 5, 1979, while Alice was 200 miles from Erie at Waynesburg, an incident involving Larry occurred at the Waite household. Sometime around midnight, Alice's parents found Larry cold and unconscious in the backyard of the Waite's home. The Waites took Larry to the hospital and the child later recovered. However, police and Children's Services were called to investigate, but their inquiries failed to definitely ascertain how the child came to be outside. Immediately upon the child's release from the hospital, Larry was detained in a Children's Services' foster home. Approximately two weeks later, the infant was adjudicated dependant. It was around this time that Alice was permitted, because of this incident, to leave Waynesburg and return home. Whereupon, on April 19, 1979, a further order was entered directing that *Alice,* not her parents, was to cooperate in a psychological evaluation and in counseling with Georgeann Setcavage, a Children's Services caseworker.

Thereafter, every month for the next nine months, Ms. Setcavage would go to the Waite's home and talk with Alice. Ms. Setcavage established three "goals" that Alice had to meet before Larry was returned to her. First, Alice had to find employment or get a high school equivalency degree. Second, Alice was to attend a parent training course. Third, Alice was to establish a residence apart from her parents.

Because Children's Services felt that Alice had not done enough to reach these goals, on July 22, 1980, a petition to involuntarily terminate appellant's parental rights to Larry was filed by the agency. At that time, Ms. Setcavage advised appellant that she could no longer visit with Larry,

as she had done every week for the preceeding year, pending disposition of the above petition. For reasons not apparent in the record, hearings were not held on this matter until March 3, 1981 and July 28, 1981. In any event, on July 31, 1981, the court entered its order extinguishing Alice's parental rights based on the court's conclusion that the evidence "clearly demonstrates that she has evidenced a settled purpose of relinquishing her parental rights." The court placed great weight on the fact that during the year between the filing of the petition and the final hearing on this matter, Alice made no attempt to call Ms. Setcavage to inquire about Larry.

At the hearing below, Ms. Setcavage testified regarding the substance of her conferences with Alice. Regarding Alice's search for a job, Alice told Ms. Setcavage that she had applied for work at many restaurants and fast-food chains in Erie, but that nothing seemed to come through. The problem was that Alice, then sixteen, was considered too young by employers. Since Alice reported no luck here, Ms. Setcavage suggested that Alice attend classes at Opportunities Industrialization Center, commonly known as O.I.C. To Ms. Setcavage's knowledge, Alice never followed through on this suggestion. As for the parent training course, Alice enrolled in the course but only attended the first of an unspecified number of classes of the six-week program. With respect to establishing "independent living," Alice, with knowledge of Ms. Setcavage, at first moved into an apartment with her boyfriend. This man was not the infant's father. When that didn't work out, Alice tried moving in with her sister, an arrangement which was deemed overcrowded by her caseworker. Ms. Setcavage was asked at the hearing why she included "independent living" as one of the goals. She replied that her primary objection to the Waite's home stemmed from the circumstance surrounding the infant's hospitalization. She felt that the infant was not adequately supervised in that home and that "there still was a potential danger in the home to Larry." Ms. Setcavage

also offered testimony regarding the regularity of Alice's visits with her child while the infant was in the care of foster parents. According to Ms. Setcavage, Alice was permitted to and did see her son on a specified day every week throughout the year. On other occasions, Alice also would ask permission to see her son on additional days, and these requests were granted "on special occasions." Ms. Setcavage was asked if she ever observed Alice with her child. She replied affirmatively and elaborated thusly:

I observed that Alice, um, showed a concern for Larry in that she played with him, enjoyed his company. Their relationship seemed to be one of an older sister type of thing. She liked to play with him; however, I think that the questions usually came as far as Larry's care came from Mrs. Waite and usually both of them were present when I saw Alice interact with Larry.

Ms. Setcavage acknowledged that Alice was only sixteen at the time of her observation.

Also testifying at the hearing were Alice's parents. Both were asked about the fateful incident involving Larry. They each testified that on the evening in question, Mr. Waite was sleeping in the back bedroom while Mrs. Waite was watching the television in the "front room." The couple's teenaged son was asleep on the couch. Young Larry had been put in his bed in the middle room, which was adjacent to Mr. Waite's room, at approximately 8:00 p. m. Around midnight, Mr. Waite awoke and went into Larry's room to check on the child, but he discovered that Larry was not there. The family began searching the house for the child. About a half an hour later, the Waite's adolescent nephew, Charles Williams, came home and suggested that a search be conducted outside, and he took a flashlight and proceeded to search the yard. Ten minutes later, Charles found Larry cold and unconscious by a fence in the yard. The Waite's surmised that 16 month old Larry, who insisted upon wearing his shoes with his pajamas to bed that night, climbed out of his crib, walked past the sleeping Mr. Waite

in the next room, went through the kitchen and into the yard. It was said that Larry could open the kitchen door because the lock on the door was broken. Alternatively, the Waite's suggested that their nephew, Charles, had something to do with the incident because he was said to be jealous of the attention showed to Larry. Because of this latter suspicion, Charles was banished from the Waite's home.

Alice Waite, appellant, was also called to the stand. She testified regarding her efforts to comply with the "goals" established by her caseworker. Alice said that she "had applications in everywhere," at various restaurants, fast-food chains, and hotels (for work as a maid), however, no one was interested in hiring her because of her age. She also stated that she had signed up for O.I.C., but that she was never called by them. As for the parent training course, Alice admitted that she only attended one of the classes but she explained that after she started the class, her father had a heart attack and she had to spend time with her family. Additionally, Alice said that since she only saw her son once a week, she didn't see the relevancy of the class to her situation. Her testimony regarding her attempts to establish a home apart from her parents generally coincided with that of Ms. Setcavage. Alice indicated that she made two attempts to find a place—once with her boyfriend and once with her sister—but neither of these arrangements was successful.

In other testimony, Alice said that while she was detained at the Waynesburg Center, besides attending classes she also attained a certificate in child care. She said that she was awarded this certificate after having "completed a course for this" and acted as a substitute schoolteacher for pre-school children for the entire length of her five month stay at Waynesburg. Furthermore, at the hearing on July 28, 1981, Alice testified that she had again signed up for the parent training course and for classes with O.I.C. to train

her in various types of office work and she indicated that both courses were to start in September.

■ When this Court is asked to review an involuntary termination of parental rights, our scope of review is limited to determining whether the court's decree is supported by competent evidence. *In re Adoption of M.M.,* 492 Pa. 457, 424 A.2d 1280 (1981). The adjudication of the Orphan's Court will not be disturbed if "the record is free from legal error and...if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence." *In Re Burns,* 474 Pa. 615, 624, 379 A.2d 535, 540 (1977). As the Supreme Court said *In re Adoption of P.,* 475 Pa. 197, 380 A.2d 311 (1977), the fact-finding function of the hearing judge and his unique opportunity to observe the witnesses and to apprise their credibility is to be recognized. Nevertheless, the Court noted that the appellate courts may not abdicate the responsibility of considering all of the testimony and determining whether those findings are supported by competent evidence. The Court wrote,

> [W]e also have a responsibility to make certain that the trial court has properly interpreted the law in relationship to the express findings of facts and other uncontradicted testimony which was not expressly rejected by the trial court. While we will not usurp the trial court's right to assess the credibility of the witnesses appearing before him, we will not condone his ignoring facts which are of record and the credibility of which is not challenged.

*Id.,* 475 Pa. at 204, n. 6, 380 A.2d at 314 n. 6.

In the instant case, the court extinguished Alice's parental rights on the basis of Section 311(1) of the Adoption Act of 1970, which provides:

> The rights of a parent in regard to a child may be terminated..., on the ground that (1) the parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing

parental claim to a child or has refused or failed to perform parental duties.

Of this section, our Supreme Court has said:

Under this provision, it must be established by a preponderance of the evidence [2] that for a period of at least six months appellants either evidenced a settled purpose of relinquishing their parental claim or that they have refused or failed to perform their parental duties. *Adoption of Farabelli*, 460 Pa. 423, [333] A.2d 846 (1975). The question of whether a parent has evidenced a settled purpose of relinquishing parental claim to a child must be analyzed in relation to the particular circumstances of the case. *In re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387 (1979); *In re Burns*, [474 Pa. 615, 379 A.2d 535 (1977)]:

*In re Adoption of M. M., supra,* 492 Pa. at 460, 424 at 1282.

■ For purposes of Section 311(1), it has long been held that inaction or lack of interest in a child for a period in excess of six months will not, standing alone, conclusively establish the required settled purpose of relinquishment; rather, it is required that there be a deliberate decision on the part of the parent to terminate the parental relationship and that the parent persisted in that determination throughout the six-month period. *Adoption of Farabelli, supra.*

■ Turning now to the court's ruling in the instant case, we find that the court's decision is premised primarily on the fact that as of March 1980, when appellant's visitation rights were cut off, appellant had "not seen the child since then and had not contacted the Agency or the caseworker to inquire about the child." We find that this basis

2. Recently, the United States Supreme Court held that under the due process provisions of the Fifth and Fourteenth Amendments of the U. S. Constitution, a state may not terminate the right of a parent to his or her child unless it is shown by "clear and convincing" evidence that the statutory grounds for termination exist. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Because we find that the evidence in the instant case failed to meet even the lesser standard of a preponderance, we need not decide whether the higher standard for termination of parental rights, found in *Santosky* applies to appellant's case. *See In re Adoption of M.E.T.,* —— Pa.Superior Ct. ——, —— n. 3 (June 25, 1982).

for the court's decision must be rejected as a "Catch-22". Alice was forbidden by Children's Services from contacting her child; Alice cannot, therefore, be held accountable for her failure to continue visiting her child as she had been doing. Neither do we find the court's latter conclusion to be a basis upon which to terminate parental rights. The rule is that a parent is to maintain a place of importance in his child's life, which means that the parent has an affirmative duty to "love, protect, and maintain communication and association with that child." *In re Adoption of McCray,* 460 Pa. 210, 216, 331 A.2d 652, 655 (1975). It must not be forgotten, however, that the measures taken by the parent to demonstrate his or her interest in a child must be viewed in light of the existing circumstances. *In re Adoption of Infant Male a/k/a J.P.M.,* 458 Pa. 77, 401 A.2d 301 (1979). In the instant case, owing to the position of Children's Services regarding appellant's visitation rights, communication and association with the child by appellant were prohibited. In this respect, appellant's case is more akin to those cases where the court found that the custodian of the child prevented the natural parent from performing the duties, such as communication and association, that otherwise would have been required.[3] *See, e.g. In re D.J.Y.,* 487 Pa. 125, 408 A.2d 1387 (1979); *In re Adoption of Vaders,* 444 Pa. 428, 282 A.2d 359 (1971). More pertinent conclusions can be deduced from an examination of appellant's conduct during that period in which visitation was permitted, which would be from March 1979 to March 1980. During this time, Alice saw her child at least once a week, for half a day. These

---

**3.** A comparable type of fact scenerio in the context of visitation while a child is in foster care, but prior to the filing of a termination petition, has been the subject of comment by one commentator in an article specifically addressing cases under Pennsylvania law. This author noted "that often caseworkers discouraged parents from visitations and then alleged in subsequent parental right termination proceedings that these parents had manifested indifference because of little or no visitations.... Although parents have claimed in abandonment proceedings that they have contacted agencies or have attempted to contact agencies concerning the welfare of their children while in foster care, the courts have not been receptive to this argument." Levine, *Caveat Parens: A Demystification of the Child Protection System,* 35 U.Pitt.L.Rev. 1, 20 n. 110 (1973).

visits were not supervised by the caseworker, although Ms. Setcavage did on occasion observe them. During the visit appellant would enjoy various activities with Larry, such as going to the zoo. The record also indicates that appellant requested additional visits, which were granted to her on special occasions. This evidence hardly describes a mother with "no interest whatsoever" in her child, as was the lower court's conclusion. We therefore find this part of the court's decision to be without factual foundation.

■ Yet this does not end our review, for while the court gave the most weight to the evidence of visitation, that was not the sole consideration of the court. The court also found that appellant "[did] not follow through on any of the points ordered by the Juvenile Court [sic] to make herself a fit mother. She failed to go to school or to get a job and failed to take any of the suggested ways to improve herself in attempting to learn how to handle this child." We find this ruling to be without factual support for several reasons. Firstly, and most importantly, *there was no evidence introduced from any source showing appellant to lack parenting skills.* Children's Services' initial contact with the Waite family was because of an incident which indisputably had nothing to do with appellant's care of Larry. The record contains no complaints regarding appellant's fitness as a mother, either during the year preceeding the incident or when appellant took the child out while it was in foster care. Therefore, the evidence does not demonstrate that appellant needed to take a parenting course or make other changes in order to be a fit mother.

Secondly, while the court ruled on appellant's failure to satisfactorily meet the goals established for her by her caseworker, the court made no examination of the goals themselves. While it might well be true that a caseworker has only the best of intentions when he establishes goals for his clients, it should nevertheless be recognized that the source of these goals is the caseworker himself, not legislative mandate. Speaking generally of the role of child welfare workers operating within the loose framework which is

characteristic of most statutes in this area of law,[4] one commentator stated the problem thusly:

Neglect, for the most part, is a subjective condition that is more easily described than defined. Statutory phraseology is typically vague and intentionally equivocal. If it were not for the special need for flexibility, such statutes would probably be held unconstitutionally vague. Judge [Patrick R.] Tamilia has noted that the protection of parents from ambiguous standards lies in the wisdom of judges rather than the detail of statutes. Initially, this informality is subject to criticism under *Gault*, [*In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)] but a realistic appraisal requires a critic to accept such flexible determinations. However, if it is the "whim" of the caseworker *rather* than the "wisdom" of the judge that determines the case, the reality is much less acceptable. Nor does the myth of agency expertise overcome the lack of standards, for as observed by Tamilia, "[s]ocial work as a profession does not provide any clearer a criteria of what constitutes neglect than does the law." Indeed, studies have shown that caseworkers cannot agree on the operative threshold of deprivation.

It is accurate to say that "casework is really not scientific at all in the sense that it makes a relentless unbiased examination of all the facts," but rather "rests on an *a priori* system of values." With this wilderness of unarticulated values, perhaps the touchstone of neglect is not poverty, but the caprice of the caseworker. Potential caseworker misperception of a need for state intervention into family privacy must therefore require effective screening mechanisms to protect the interests of parents and their children.[5]

4. See Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 Stan.L.Rev. 985, 1000 (1975).

5. Levine, *supra*, note 4 at 17–18 (footnote omitted). See also Lowry, *The Judge v. The Social Worker: Can Arbitrary Decisionmaking be Tempered by the Courts?* 52 N.Y.U.L.Rev. 1033 (1977); Tamilia, *Neglect Proceedings and the Conflict Between Law and Social Work*, 9 Duq.L.Rev. 579 (1971).

In the case at bar, two of the goals which appellant was faulted for failing to achieve were the establishment of independent living arrangements and finding employment to support herself and her son. It is questionable whether a just society should require a minor parent to emancipate him—or herself as a condition for forestalling the termination of such minor's parental rights. The feasibility of goals of this nature should be examined when a court is ruling on a termination petition. As an example, we refer to the fact that minors can be employed only in jobs that meet the strictures set forth in the child labor laws.[6] The record shows that appellant did make an effort to meet the goals demanded of her and, in view of her age at the time, we find that her lack of success in this area cannot be greatly weighed against her.

Accordingly we find that the evidence fails to support a finding that appellant evidenced a settled purpose of relinquishing her parental rights. While the infant Larry was in foster care, appellant visited the child regularly and frequently up until the time that her visitation privileges were cut off. Additionally, appellant did work towards the satisfaction of the various goals imposed upon her.

Reversed.

**6.** *See* 43 P.S. §§ 41 et seq. (Supp.1982).