590

515 A.2d 883

## In re ADOPTION OF J.J.

### James PHILLIPS, Appellee,

v.

### CHILDREN AND YOUTH SERVICES OF DELAWARE COUNTY, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 6, 1985.

Decided Sept. 26, 1986.

Alfred Jason Mattei, Media, for appellant.

Robert J. Levis, Nicholas J. Kelly, III, Media, for AMICUS—Prospective Adoptive Parents.

Frank J. Eisenhart, Jr., Philadelphia, for James Phillips.

G. Guy Smith, Media, for James Johnson.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This is an appeal from an Order of the Superior Court[1] which reversed an Order of the Court of Common Pleas of Delaware County, Orphans' Court Division, terminating pa-

---

1. *In re: Adoption of James J.,* 332 Pa.Superior Ct. 486, 481 A.2d 892 (1984).

rental rights of the Appellee-Father, James P., with respect to his son, James J. A Petition for the Involuntary Termination of Parental Rights was filed by the Appellant herein, Children and Youth Services of Delaware County (C.Y.S.) and, following a hearing before the Honorable Francis J. Catania, President Judge, on May 18, 1981, Appellee's parental rights were terminated pursuant to Sections 2511(a)(2) and 2511(a)(5) of the Adoption Act of 1980.[2]

In a separate proceeding in the Trial Division, Appellee filed a petition requesting visitation with James pending appeal of the termination case. This petition was denied on September 28, 1981. Appellee subsequently appealed both orders and a Superior Court panel affirmed (Cavanaugh, J. dissenting). Appellee's Petition for Reargument was granted. The Superior Court *en banc* reversed (Cirillo, J. dissenting) the order of the Orphans' Court. C.Y.S. petitioned this Court for appeal and we granted allocatur. For the reasons set forth herein, we reverse.

The issues in this appeal are (1) whether the order and judgment of the Orphans' Court of Delaware County terminating the parental rights of Appellee under Sections 2511(a)(2) and 2511(a)(5) of the Adoption Act of 1980 were supported by clear and convincing evidence; and (2) whether a parent suffering from a mental or physical impairment should be held to the same standard of proof in involuntary termination cases as a parent who is not so impaired.[3]

Our scope of review, as well as the burden of proof in involuntary termination cases, has been clearly defined and reiterated in several recent decisions by this Court. In *Matter of Adoption of G.T.M.*, 506 Pa. 44, 483 A.2d 1355 (1984), we stated:

> In cases where there has been an involuntary termination of parental rights by the Orphans' Court, the scope of

2. Act of October 15, 1980, P.L. 934, No. 163, § 1, as amended, 23 Pa.C.S. § 2101, et seq., effective January 1, 1981.

3. This issue was not answered or discussed by the Superior Court, as it was raised by this Court in our Order of June 21, 1985, granting the Petition for Allowance of Appeal.

appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. *In re Adoption of B.D.S.*, 494 Pa. 171, 177, 431 A.2d 203, 206 (1981). If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal. See *In re Adoption of M.M.*, 492 Pa. 457, 460, 424 A.2d 1280, 1282 (1981). It is established that, in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re T.R.*, 502 Pa. 165, 166, 465 A.2d 642, 642–643 (1983).

*Id.*, 506 Pa. at 46, 483 A.2d at 1356. Further, unless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. *In re: Adoption of J.S.M., Jr.*, 492 Pa. 313, 316, 424 A.2d 878, 879 (1981). The trial court, as trier of fact, is the sole judge of credibility of witnesses. *In re Green*, 486 Pa. 613, 619, 406 A.2d 1370, 1373 (1979); *Adoption of S.H.*, 476 Pa. 608, 611, 383 A.2d 529, 530 (1978). Conflicts in testimony are to be resolved by the trier of fact and we may not disturb a decree of Orphans' Court based upon findings supported by the record unless Orphans' Court applies an incorrect legal standard. *Id.*, 476 Pa. at 611, 383 A.2d at 530.

The circumstances surrounding this case are set forth as follows. On December 19, 1979, James J. was born out of wedlock to Marie J. and allegedly fathered by Appellee. On December 31, 1979, protective custody was awarded to Appellant when Marie was involuntarily committed to Haverford State Hospital. Marie's parental rights were terminated on December 15, 1980, on grounds of incapacity to perform parental duties pursuant to 23 Pa.C.S. § 2511(a)(2).

The child is still within Appellant's protective custody and it is their desire to place James, now six years old, for adoption if, and when, Appellee's parental rights are terminated. To that end, Appellant filed a Petition to Terminate the Parental Rights of Appellee on January 23, 1981, pursuant to Sections 2511(a)(2) [4] and 2511(a)(5) [5] of the Adoption Act of 1980. Appellee's parental rights were terminated following the determination by Judge Catania that Appellee had demonstrated repeatedly an incapacity to perform parental duties for his child, that the child had been removed from the care of the parent for a period in excess of six (6) months, and that the conditions leading to the removal continue to exist and cannot be remedied. Thus, the statutory criteria of Section 2511(a), which would result in termination, had been met.

In *La Rocca Trust*, 411 Pa. 633, 192 A.2d 409 (1963), we articulated what is required in order to meet the clear and convincing burden of proof:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncon-

**4.** 23 Pa.C.S. § 2511(a)(2) provides:
The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

**5.** 23 Pa.C.S. § 2511(a)(5) provides:
The child had been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

tradicted ... provided it "carries conviction to the mind"
or carries "a clear conviction of its truth" ... (Citations
omitted.)

*Id.,* 411 Pa. at 640, 192 A.2d at 413.

Our review of the evidence presented in the Orphans'
Court reveals that the Decree of Termination was supported
by clear and convincing evidence. It is undisputed that
when the petition for termination of parental rights was
filed, James J. was in the custody of C.Y.S. and had been in
such custody since birth. During that period, Appellee
never assumed any parental responsibility nor has he, at
any time, offered or given support for the child. In April of
1980, he questioned his paternity, wondering whether the
mother's statements, that she had been artificially insemi-
nated by the Duponts or Jimmy Carter, were true, and said
he wanted to take a fertility test to determine if he was the
father. Appellee said, on cross-examination, that he did not
remember saying this; however, he did admit that he had a
blood test taken to determine if he was the father of James
J.

Mr. Peter Spengeman, the social worker assigned to this
case, testified that during the first year of James J.'s life,
Appellee did have several visits with the child, but would do
so only in the company of, and at the insistance of, Marie J.,
the natural mother. During these visits, Appellee would
hold James briefly on his knee, at the urging of Mr.
Spengeman, and would never embrace the child or call him
by name. Appellee would tease the child and make no
effort to comfort him despite the child's crying. Appellee,
himself, never requested a visit with James until after he
received notice of these termination proceedings and, al-
though the frequency of Appellee's visits has increased
since then, they remain devoid of any appropriate interac-
tion between him and the child.

Mr. Spengeman also testified that throughout 1980, he
attempted to provide planning meetings and to counsel
Appellee; however, Appellee failed to attend meetings, was
uncooperative and hostile, and denied Mr. Spengeman

admittance to his home on three occasions. During this time, when Mr. Spengeman did communicate with Appellee, he consistently indicated that he had no plans for taking care of James, that he knew nothing about caring for a child, and that he would not want to burden his mother with that responsibility. Appellee stated that he thought about getting married to a girlfriend, but did not want to burden her either. Appellee repeatedly stated that he could not care for the child and showed no motivation to accept any services from Appellant to remedy the situation.

The record also reveals that Appellee has been admitted to Haverford State Hospital three times since 1979, the diagnosis being chronic schizophrenia with mood disturbance. Dr. Herman Boerner testified that, at the time of the hearing, Appellee had been under his care for approximately two years, that he had prescribed medication which was necessary to keep his condition under control, and that Appellee's disorder was of moderate to mild severity. Dr. Boerner further stated that the medication was administered in conjunction with very superficial supportive psychotherapy at six-week intervals, and that Appellee had, since the previous fall (1980), maintained himself on the medication, and kept his appointments for the most part, missing only a few times.

However, on cross-examination of Dr. Boerner, the following exchange took place with regard to the progress of Appellee:

BY MR. MATTEI:

Q. You say he has been, I will use the term good, since the fall of 1980. Hasn't it been more like maybe the winter of 1981 (sic) that he has been on this medicine and been doing good?

A. I don't remember, but he has been out of the hospital, which is good.

Q. Didn't you have a conversation, and tell me if I am wrong, with Peter Spengeman in the fall of 1980, at which time you told Mr. Spengeman that he never takes his medicine, he doesn't want to meet with me, meaning

yourself, what can you do with people like that, he doesn't want to cooperate, he doesn't feel he needs his medicine. Did that conversation take place in the fall of 1980?

A. It may have.

Q. And another conversation in January of 1981 when you told Mr. Spengeman that he was taking his medicine, he was meeting with you?

A. Yes.

Q. Doesn't this gentleman have a history of not taking his medicine and not cooperating?

A. That is true.

Q. So right now he is having a good period, is that not correct?

A. Yes.

Q. And has he not had good periods in the past?

A. Not this good in terms of professionally and maintaining himself for a period of time.

Q. Being as familiar as you are with his record, has he ever been diagnosed as a manic-depressive?

A. Yes.

Q. Is that still apparent?

A. No.

Q. Is that something that disappears?

A. No. The diagnosis is sometimes pretty difficult to establish in terms of whether this is a schizo-affective or a manic-depressive illness. It changes, and diagnoses are based mainly on symptoms anyway. Sometimes one part of the illness is more apparent than another.

Q. But he has been diagnosed as a manic-depressive?

A. Yes.

Q. And would you equate that with what you indicated as a mood disorder?

A. That is a mood disorder, right.

Q. Does he still have the mood disorder?

A. Presumably.

\* \* \* \* \* \*

Q. Now you say he is functioning, he is maintaining a job. What job does he have, Doctor?

A. His work as a musician. He says he has an agent and bookings and plays at nightspots.

Q. And you have discussed this with him?

A. Yes.

Q. And you say you see him once every six weeks?

A. True.

Q. And so do you feel that that is helping him, he has an interest now, he is working?

A. Yes.

Q. Doctor, he has testified here today, you were sequestered, and he has indicated that he has had as many as six such jobs over the past year. Were you aware of that?

A. Oh yes.

Q. Do you feel that that is a sufficient amount to generate interests for him, six in one year?

A. Yes, because it is the nature of the job. One, it is not an engagement for a period of time.

Q. When was his last show or entertainment, Doctor?

A. I wouldn't know. It has been a while since I have seen him.

Q. Well, six weeks ago presumably you saw him, if you saw him every six weeks?

A. I am not familiar with the last time I saw him, I can't give you the date.

Q. When you saw him the last time, Doctor, whenever that was, how many weeks had it been since he worked then?

A. He had worked the week before I think, or two weeks before that.

Q. A week or two weeks before that, so assume maybe eight weeks ago today?

A. Yes.

Q. Where did he work then, Doctor?

A. A spot in Ardmore.

Q. Did you ever check up to determine whether he actually worked at these places?

A. No.

Q. You say he is looking for a part-time job. He told you that what, eight weeks ago?

A. This is part of the testimony today. ...

Q. So he never told you that in consultation?

A. I can't recall the specific words, or I don't remember. (N.T. 5/18/81, pp. 110–114).

Dr. Boerner also stated on cross-examination that if Appellee did not take his medication there would be "the possibility of recrudescence of a more active illness." In response to cross-examination by Mr. Smith, counsel for the child, Dr. Boerner stated that he could not recall whether Appellee discussed his intentions with regard to his son, nor could he recall that Appellee even brought up the topic of his son at any time during 1980.

Appellee testified that he wished to establish and maintain a relationship with his son, and to plan for the future and care for the child in a proper environment. Appellee explained his sporadic visits with the child as a reluctance on his part to usurp the rights of the natural mother and that he had no way of taking care of the child on his own. He further stated that he liked holding the child and that, although he was a bit awkward, he tried to do his best. Appellee expressed a desire to regain visits with the child and to work toward achieving custody. He felt that his prognosis for the future was good; things looked better for him, both professionally and emotionally. Appellee said that he had "contacted a course given by the Red Cross" which covers parental duties and the care of a young child. Appellee stated that he had cooperated with C.Y.S. and that he had requested visits with the child prior to the termination of Marie's parental rights. He admitted that prior to this termination, he only came to visit with Marie and that he told the social worker that he did not want the child, but that Marie should have him.

Finally, Appellee stated that he has gotten more comfortable with the child in the last few visits, and when the child cried, Appellee picked him up. When asked why he never referred to the child by name, Appellee stated that he did not recall not saying his name, but that he has quite a bit of interaction with the child.

On this record, Judge Catania found that the grounds for terminating Appellee's parental rights under Section 2511(a) were proven by clear and convincing evidence. Although he did not specify whether his determination was based on § 2511(a)(2) or § 2511(a)(5), we think it is clear from the record that both sections were considered and that there was competent evidence to sustain a termination under either section.

■ Under Section 2511(a)(2), it must be established that there has been repeated and continued incapacity, abuse, neglect or refusal which has caused the child to be without essential parental care, control or subsistence, and that the causes of this incapacity, abuse, neglect or refusal cannot or will not be remedied. Although the testimony was conflicting on many points, it was the task of the Orphans' Court to resolve the conflicting testimony presented by the witnesses. Judge Catania found the testimony of Mr. Spengeman more credible than that of Appellee. He also found that Dr. Boerner was unclear as to when Appellee's progress began and, under cross-examination, his knowledge of Appellee was severely discredited. This was consistent with his role as trier of fact and there was no abuse of discretion.

■ Section 2511(a)(5) of the Adoption Act provides that when a child has been placed under the care of a Children's Services Agency for a term in excess of six months, parental rights may be terminated if the conditions which led to the removal cannot or will not be remedied by the parent within a reasonable time. In the instant case, the record clearly shows that the child was in the custody of C.Y.S. virtually from birth, approximately seventeen (17) months

at the time of the hearing. Appellee has never had custody of, nor provided support for, his child. He never requested a visitation with the child on his own initiative during the first year of the child's life. In fact, he did not request visitation until after he received notice of the termination proceeding. Appellee was uncooperative and hostile to all efforts made by C.Y.S. to assist him in establishing a relationship with his child and planning for the child's future. Appellee failed to keep appointments, refused to permit the social worker into his home, and shouted obscenities and hung up on the social worker on two occasions. His visits with the child were devoid of any appropriate interaction, and were characterized by very minimal physical contact, teasing on the part of Appellee, and crying by the child.

We believe that this evidence is sufficient to satisfy the criteria of § 2511(a)(5) by clear and convincing evidence. The fact that Appellee has now expressed an interest in working toward gaining custody of the child does not satisfy the affirmative duty which is required of Appellee. "When a child has been placed in foster care, a parent has an affirmative duty to work towards the return of the child." *In re: William L.*, 477 Pa. 322, 333, 383 A.2d 1228, 1233 (1978). We think this "affirmative duty," at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities. The agency must, of course, put forth a good faith effort in making services available to the parent and, once it has done so on a continuing basis, it has discharged this obligation. The record clearly shows that C.Y.S. made efforts to counsel Appellee and to assist him in planning for the child's future. These efforts were met with open hostility by Appellee and repeated assertions by him that he could not take care of the child and had no desire to do so. As aptly stated by Judge Catania, "[T]he parent cannot sit back, especially in factual situations like the ones presently before the Court involving the mental incapacity of the

parent, and expect the agency to effect a 'cure' for the individual and then when such 'a cure' is not forthcoming, blame the agency for the failure." (Slip opinion at p. 15).

The official comment to § 2511(a)(5) of the Adoption Act of 1980, states: "The Court must consider the services offered by or available from the agency and the efforts made by the parent to effect a lasting adjustment of the conditions which led to the child's removal from the home." The record shows that Appellee has not made any effort to remedy the situation, or to improve his ability to perform parental duties. Appellee testified that "he contacted a course given by the Red Cross which covers parenting." This was apparently done after termination proceedings began, and no evidence was offered that Appellee had actually taken the course or that he ever intended to take it.

We have previously held that a renewal of interest after the six-month statutory period has passed will not revive parental rights toward the child. *Adoption of McCray*, 460 Pa. 210, 217, 331 A.2d 652, 656 (1975). We think this is a case of too little effort, too late. Appellee has taken no positive concrete step in removing his inability to care for the child other than to seek visitation. "Parental rights may not be preserved ... by merely waiting for some ... convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with [his] immediate and continuing physical and emotional needs)." *McCray, supra*, 460 Pa. at 217–18, 331 A.2d at 657.

We think the hearing court acted in the best interest of the child in granting the termination order, and to hold otherwise would place the child in limbo with no indication that Appellee will ever be willing or able to assume and carry out his duties as a parent.

It is the policy of this Commonwealth to preserve and protect the family wherever possible against unwarranted intrusions by the State, *In re: William L.*, 477 Pa. 322, 335, 347, 383 A.2d 1228, 1234, 1240 (1978), and it is our desire to insure that the parental rights of a parent not be involun-

tarily terminated on the sole basis of physical or mental impairment without regard to its effect on the child. To that end, we requested as part of this appeal that the parties brief and argue the issue, not previously addressed by this Court, whether involuntary termination of parental rights cases involving a parent who is suffering from a mental or physical impairment requires application of a different standard of proof than cases involving a parent who is not so impaired.

Prior to the United States Supreme Court decision in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the law of this Commonwealth was that the standard of proof required in *all* involuntary termination of parental rights cases was by a preponderance of the evidence. *In re: Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981); *In re: Adoption of M.M.*, 492 Pa. 457, 424 A.2d 1280 (1981); *In re: Adoption of J.S.M., Jr.*, 492 Pa. 313, 424 A.2d 878 (1981); *In the Interest of T.S.L.*, 487 Pa. 245, 409 A.2d 332 (1979); *In the Matter of the Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978); *In re: Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975). In *Santosky, supra,* the Court declared that due process requires that, in cases of this type, the state must establish the relevant conditions for termination of parental rights by at least "clear and convincing" evidence; however, determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts. *Id.*, at 769–770, 102 S.Ct. at 1402. The Court mandated the use of an "intermediate standard of proof because the individual interests at stake were both 'particularly important' and 'more substantial than mere loss of money.'" *Id.*, at 756, 102 S.Ct. at 1396, (quoting *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).

We subsequently adopted the "clear and convincing" standard in *In re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983), wherein we stated: " ... we are ... persuaded by the reasoning of *Santosky*, and thus adopt it as a matter of

state law applicable to *all* termination proceedings." (Emphasis added). 502 Pa. at 166, 465 A.2d at 643.

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re: William L.*, 477 Pa. at 345, 383 A.2d at 1239.

■ In determining whether parental rights should be terminated, the court must recognize the essential needs of the child as well as the rights of the parent. *Id.*, 477 Pa. at 337, 383 A.2d at 1235.

> When ... a parent is incapable of meeting the child's essential needs, ... the state may constitutionally intervene to protect the "physical or mental well-being" of the child. In these circumstances, the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail. This legislative determination must be accorded great deference for "when an issue involves policy choices as sensitive as those implicated by [the involuntary termination of parental rights], the appropriate forum for their resolution in a democracy is the Legislature." (Citation omitted.)

*Id.*, 477 Pa. at 339, 383 A.2d at 1236.

The United States Supreme Court, in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), discussed the function of a standard of proof. That Court stated:

> The function of a standard of proof, as that concept is embodied in the Due Process clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular

type of adjudication." ... The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision. *Id.,* at 423, 99 S.Ct. at 1808.

*Addington* held that in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital, a "clear and convincing" standard of proof is required by the Fourteenth Amendment. The *Addington* Court concluded that application of a "beyond a reasonable doubt" standard is inappropriate in civil commitment proceedings because of its hesitation to apply that unique standard "too broadly or casually in noncriminal cases," *id.,* at 428, and because the psychiatric evidence ordinarily adduced at commitment proceedings is rarely susceptible to proof beyond a reasonable doubt. *Id.,* at 429–430, 432–433.

The *Santosky* Court relied on *Addington* in rejecting the beyond a reasonable doubt standard in parental rights termination cases. While noting that in the Indian Child Welfare Act of 1978,[6] Congress requires "evidence beyond a reasonable doubt" for termination of Indian parental rights, the Court concluded that "Congress did not consider, however, the evidentiary problems that would arise if proof beyond a reasonable doubt were required in all state initiated parental rights termination hearings." *Id.,* at 769, 102 S.Ct. at 1403. For example, "[l]ike civil commitment hearings, termination proceedings often require the factfinder to evaluate medical and psychiatric testimony, and to decide issues difficult to prove to a level of absolute certainty, such as lack of parental motive, absence of affection between parent and child, and failure of parental foresight and progress." *Id.,* at 769, 102 S.Ct. at 1403. We agree with the reasoning of the *Santosky* decision that a reasonable doubt standard would erect an unreasonable barrier to state efforts to free permanently neglected children for adoption. *Id.,* at 769, 102 S.Ct. at 1403. This is as true in

6. PUB.L. 95–608, § 102(f), 92 Stat. 3072, 25 U.S.C. § 1912(f) (1976 ed., Supp. IV).

cases of mentally or physically impaired parents as it is in cases where the parents do not suffer from such disability.

We find no merit to the argument that unless we apply the more rigorous standard, mentally or physically impaired parents' rights may be terminated solely on the basis of the impairment without regard to fault on the part of the parent, and with no evidence of any voluntary act or omission by the parent which was harmful to the child's interest.

■■■■ The statutory basis for terminating involuntarily the rights of a parent with a mental or physical impairment is Section 311(2) of the Adoption Act of 1970, 23 Pa.C.S. § 2511(a)(2). The statute makes it clear that grounds for termination can consist of lack of capacity and not just affirmative misconduct. Judicial inquiry is to be centered on the best interest of the child, rather than the fault of the parent.[7] But this is only after the parent's incapacity is proven by clear and convincing evidence. Absent sufficient evidence to satisfy the statutory requirements for involuntary termination, the question of best interest of the child never arises. *Adoption of McAhren*, 460 Pa. 63, 331 A.2d 419 (1975). We think that the "clear and convincing" evidence standard is sufficient on balance to preserve the rights of impaired parents, while making due allowance for the State's legitimate concerns. Moreover, to adopt a reasonable doubt standard in mental/physical incapacity cases, which by their very nature are rarely susceptible to proof of such a degree, would, in many cases, thwart the intent and purpose of the Legislature by ignoring the interests of the child, with the result that many permanently neglected children would be "consigned indefinitely to the limbo of foster care or the impersonal care of institutions." *In re: William L.*, 477 Pa. at 349, 388 A.2d at 1241.

7. The 1970 comment following 23 Pa.C.S. § 2511 notes that: Clause (2), suggested by Section 19(c) of the Revised Uniform Juvenile Court Act (1969), differs from "abandonment" in that it centers judicial inquiry upon the welfare of the child rather than the fault of the parent.

Only two states, New Hampshire and Louisiana, have barred parental rights terminations unless the key allegations have been proved beyond a reasonable doubt.[8] We think the State's parens patria interest in preserving and promoting the welfare of the child and its goal to provide it with a permanent home is sufficient to preclude imposition of the higher burden of proof.

■ In summary, upon our review of the briefs and arguments submitted, our case law, and the standards prevailing in other jurisdictions, we are satisfied that the same legal standard and burden of proof should be applied for the involuntary termination of parental rights of a parent with a mental and/or physical impairment as is applied to any other parent. We wish to emphasize, however, that the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment or the fact that the impairment may make the parent less desirable than another parent. The purpose is to protect the welfare of the child. So long as the parent makes a sincere effort and takes advantage of the services offered to improve his condition and ability to fulfill parental obligations, and the child's essential physical and emotional needs are met, there should not be a termination of parental rights. The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied.

What is important is the demonstrated willingness and ability of the parent to perform, at a minimal level, his or her parental duties. A parent's performance "must be measured in light of what would be expected of an individual in circumstances in which the parent under examination finds himself." *Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981); *Matter of Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978).

8. See, *State v. Robert H.*, 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978); La.Rev.Stat.Ann. § 13:1603A (West.Supp.1982).

Clearly, the facts and circumstances of each case must be considered on a case by case basis. So long as the procedural and substantive due process rights of an impaired parent are given full protection, the fact that a parent suffers from a physical or mental impairment does not require any alteration of the standard to be applied in an involuntary termination of parental rights case.

We reverse the Order of Superior Court and remand for consideration of the issues not disposed of in its prior review.