**In re Adoption of Ashlee M.B.**

C.P. of Berks County, no. 73806.

*LeRoy G. Levan,* for petitioner.
*Phelps T. Riley,* for respondent.
*Gilbert M. Mancuso,* guardian ad litem.

SCHMEHL, *J.,* May 17, 1996—This matter comes before the court on a petition to terminate the parental rights of William H.B. The child at issue is Ashlee M.B., a female child born on December 20, 1989. The

child's mother is Katherine J.A. The child's natural father is William H.B. David R.A., Katherine's husband, seeks to adopt Ashlee.

From the time of Ashlee's birth until she was 5 months old, William lived with Katherine and Ashlee. After William left, Katherine remained at that same address another seven months, during which period William would contact her at that address. Katherine and Ashlee have lived at three other addresses since Ashlee's birth. William apparently enjoyed regular contact with Ashlee up until June 1992.

Ashlee was in William's custody from Friday, June 26, 1992 at 6 p.m. through Sunday, June 28, 1992 at 7 p.m. After the child was returned to her, Katherine noted that the child was "not acting right," was irritable and not sleeping well, and had blood in her diaper. Katherine and David brought the child to the Reading Hospital and Medical Center for an evaluation. The report of the physical exam did not confirm or rule out possible sexual abuse, but found there was no evidence of trauma. The matter was reported to Child Protective Services.

Katherine testified that after June 1992 she cannot recall the next time she spoke with William, although she does recall she saw him at a support hearing in 1994.

William confirmed that he saw Ashlee on a periodic basis up until June 1992. He has not had contact with Ashlee since the alleged abuse incident. In July 1992 he began to meet with Brandy Neider of Berks County Children & Youth Services, who asked that he refrain from visiting the child pending the investigation. He complied with the request. He sent no cards or such to the child because of this request. In the summer of 1992, William had consulted with David Dautrich, Esquire regarding visitation. He claims to have never received copies of certain documents forwarded to At-

torney Dautrich by Children & Youth Services and that Attorney Dautrich told him he was having trouble getting the papers from Children & Youth Services. In 1992 he testified that he received no notice that the investigation was complete.

William testified that he did not pursue expungement after he spoke with Attorney Dautrich because he was unemployed and had no stable home, and because he was involved in a car accident in May of 1992 which resulted in him needing 270 stitches in his head. He testified in 1993 he received one letter, and then in May or June of 1994, he learned the investigation was completed after speaking to an attorney regarding visitation. The attorney suggested William contact Children & Youth Services. William testified that he began to seek visitation in 1994 because he was emotionally stable and had married in December of 1993. He now has a daughter named Alissa, born in May of 1995.

Brandy Neider, a Child Protective Services investigator for Berks County Children & Youth Services, testified that she was aware of the report of sexual abuse on Ashlee and that she investigated the report. She told William the results of the investigation, and at the outset of the investigation told him not to see Ashlee until it was completed. She testified that at the end of the investigation she sent a letter to William that the investigation was closed and that the report was indicated. She referred William to Reading Specialists. William saw Dr. Robert Gill one time for an evaluation and allegedly received no report nor any instructions. Ms. Neider sent a report of the sexual abuse allegations to the police. She could not recall ever telling William that he could recommence visitation.

An expungement hearing was held, for which Ms. Neider was present. Ashlee was ruled to be an incompetent witness, and as the matter could not be pursued,

the record was expunged. It was Ms. Neider's opinion that the sexual abuse actually occurred. Since the record has been expunged, the court cannot base its decision upon the alleged sexual abuse. However, the alleged sexual abuse incident is integral to this case in that William justifies not pursuing contact with Ashlee prior to the summer of 1994 with the instruction that he was not to have contact with Ashlee and that he never received notice that the investigation was completed. William adamantly denies sexually abusing Ashlee.

Gilbert M. Mancuso, Esquire was appointed as guardian ad litem on behalf of Ashlee. He prepared and presented two reports for the court's review. It was his finding that, "notwithstanding the outcome of [William's] expungement attempts, [William] has failed or refused to perform his parental duties and has evidenced a settled purpose of relinquishing his parental claim as to Ashlee, especially as the undersigned does not perceive his justifications for absences from Ashlee's life to be reasonable." (Report of guardian ad litem filed February 8, 1995, p. 10, paragraph 5.) The guardian ad litem suggested that an independent qualified psychiatrist or psychologist evaluate Ashlee's "intangible needs," beyond William's "tangible" failures to parent her. At the end of this court's hearing on October 25, 1995, the court proposed, and counsel agreed, that the matter would be continued pending an evaluation. Counsel was given five days to choose an evaluator, and then 15 days to submit proposed guidelines for the evaluator performing the evaluation. Counsel was further given the option to request argument or to submit briefs on the matter. It was not until November 8, 1995 that the court received a fax from Attorney Levan, Katherine's attorney, which outlined a proposal for evaluation.

On February 2, 1996, this court entered a memorandum and order which set forth the standard for ter-

minating parental rights, including the evidencing of a settled purpose to relinquish parental claim or refusal or failure to perform parental duties, and once that initial burden is met, whether termination will clearly serve the needs and welfare of the child. This court, in an effort to make the best decision as to whether or not William's parental rights should be terminated, ordered that an evaluation be performed by Peter Thomas, Ph.D. to consider, along with the termination criteria set forth in the memorandum and order, whether the father was a risk to the health, safety and welfare of the child, the likely emotional effects of a continuing relationship with her biological father or the effect of the termination of such contact, the evaluator's perception of the child's current state regarding her biological father and stepfather, what bond, if any, the biological father has with the child, and any conclusions as to the mental health of all the parties, most especially because of the allegations of past sexual abuse. The costs for each party were to be borne equally. The order further provided that after the court received the evaluator's report, either party would have 10 days to request a further hearing on the matter limited to direct and cross-examination of Dr. Thomas, the evaluator. Upon failure to request the court for such a hearing, the court was to render a decision upon the existing record together with Dr. Thomas's report. On April 1, 1996, Dr. Thomas contacted the court by letter (with copies sent to counsel of record for each party) stating that he had evaluated Katherine, David and the child, but despite repeatedly scheduling William, he failed to appear for the evaluation. His letter stated that he would not be scheduling William any further "as his lack of response and attendance at the first two meetings is a statement of his involvement with his daughter." The letter further stated that a copy of the letter was being sent to William's attorney, so that he could com-

municate it to his client. Dr. Thomas further stated that he would be willing to see William if he was willing to come in the future. On April 24, 1996, this court informed Dr. Thomas, by letter, that he should submit a report on the information he had gathered and the people he had evaluated. Dr. Thomas's evaluation was submitted to the court on or about April 30, 1996.

Dr. Thomas stated that Katherine and David enjoyed a good relationship with the child, and that the child was well bonded to both, and that the three of them functioned in an appropriate family manner and demonstrated no significant problems. Dr. Thomas found it crucial that William was not willing to participate in the evaluation, and that Katherine stated that William had had a long period of no contact with the child. Dr. Thomas took as very significant William's current choice not to pursue the evaluation, and felt he was not demonstrating a motivation to be involved with his daughter or functioning in an appropriate paternal manner. Dr. Thomas further stated that the effect of terminating William's parental rights was mixed in that on the positive side it would give Ashlee and the family some sense of closure and boundary and would promote a sense of stability and reinforce an existing family relationship, and furthermore, if William had indeed behaved in such a destructive manner as previously charged, termination would be positive. However, he stated that on the negative side, Ashlee would lose a potential relationship with a paternal figure, but since Ashlee had no positive feelings about the relationship and could not demonstrate any wish to be involved in that relationship, Dr. Thomas then stated "[o]verall it appears that termination of parental rights would not have a negative effect on Ashlee."

During the evaluation, Dr. Thomas questioned Ashlee about William, and Ashlee clearly stated she did not want to talk about him and then apparently became

more distressed and anxious when his name was raised in conversation. At a second meeting with Dr. Thomas, Ashlee stated she had no memory of William and said she did not miss him. Dr. Thomas stated that throughout the evaluation he would periodically return to the subject of William with Ashlee, but that she was simply unwilling to discuss her father and her feelings about her father. Dr. Thomas stated "[s]he is closed emotionally with regard to that relationship." Dr. Thomas further stated he could find nothing in either Katherine or David's personalities or evaluations to show that adoption would be detrimental to the child.

In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by " '. . . clear and convincing evidence' the existence of grounds for doing so." *In re E.S.M.,* 424 Pa. Super. 296, 302, 622 A.2d 388, 392 (1993); *In re Adoption of J.J.,* 511 Pa. 590, 594, 515 A.2d 883, 886; *In Interest of Coast,* 385 Pa. Super. 450, 468, 561 A.2d 762, 771 (1989), *alloc. denied,* 525 Pa. 593, 575 A.2d 560 (1990). To meet this burden,

"The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries conviction to the mind or carries a clear conviction of its truth." *In re Adoption of B.G.S.,* 418 Pa. Super. 588, 598, 614 A.2d 1161, 1166 (1992), quoting *In re Adoption of J.J., supra.*

The court must consider all of the circumstances in determining whether a parent has fulfilled his obligations and must measure a parent's performance in light of what would be expected of any individual under

similar circumstances. *In re V.E. and J.E.,* 417 Pa. Super. 68, 611 A.2d 1267 (1992). (citations omitted) It is the court's decision that, considering all the circumstances, Katherine and David have met their burden to prove that William's parental rights should be terminated.

23 Pa.C.S. Section 2511 sets forth the grounds for involuntary termination of parental rights. Section 2511 states, in part:

"(a)(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. . . .

"(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. . . ."

It is not required that both an intention to relinquish parental control and a failure to perform parental duties be established. *In re E.S.M., supra* at 302, 622 A.2d at 392. (citations omitted) In this case, William has failed in his parental duties for six months. However, parents who fail to meet their parental obligations for a six-month period do not automatically forfeit their parental rights; the six-month requirement in the involuntary termination of parental rights statute should not be mechanically applied. *Id.* Evidence of parental inaction and lack of interest in excess of six months will not conclusively establish a "settled purpose" to relinquish. *In re Adoption of R.W.B.,* 485 Pa. 168, 174, 401 A.2d 347, 350 (1979). (citations omitted) This "settled purpose" requires a deliberate decision to terminate the parental relationship. *Id.* at 174, 401 A.2d at 350.

A parent wishing to retain parental rights must make efforts to maintain a place of importance in the child's life, although such efforts must be viewed in light of the totality of the circumstances. *Baby Boy A. v. Catholic Social Services,* 512 Pa. 517, 522, 517 A.2d 1244, 1246 (1986). (citations omitted) In attempting to preserve

parental rights, a parent must pursue a course of conduct during the period in question consistently aimed at maintaining the parental relationship, using those sources reasonably available and exercising persistence in attempting to overcome obstacles placed in the path of the parent/child relationship. See *In re D.J.Y.,* 487 Pa. 125, 408 A.2d 1387 (1979) (citations omitted); accord, *In re E.S.M., supra* at 296, 622 A.2d at 388. The court must also assess any explanation of extenuating circumstances, including evaluation of any barriers placed in William's way. *In re E.S.M., supra* at 306, 622 A.2d at 393. (citations omitted)

William contacted Attorney Dautrich in 1992 regarding visitation, but never followed through on his inquiry. Not until 1994 did William contact Attorney Jeffrey Howell, who advised him to first seek expungement of the sexual abuse record prior to seeking visitation rights. William claims that he attempted to re-establish visitation but that Katherine refused the request, and he had never filed anything with the court to pursue visitation. He admitted he did not pursue visitation until 1994. In 1994, when he learned the investigation was completed, he requested an expungement of the sexual abuse allegations. He was subsequently served with the petition to terminate rights in October 1994. He admitted that he knew that Attorney Levan was Katherine's attorney, and that he might have known he could contact Attorney Levan to establish visitation with Ashlee. There was little or no evidence of obstructive tactics used by Katherine or anyone else. William's explanation for the delay was that his life had been unstable, and that he was now married and had settled down.

William's other reason for not pursuing visitation was that he was under the impression he was to have no contact with the child as per the instructions of Berks County Children & Youth Services. The case

of *Matter of Adoption of Barnett,* 304 Pa. Super. 514, 450 A.2d 1356 (1982) dealt specifically with a Children's Services Agency in a proceeding to involuntarily terminate a parent's rights. In *Barnett,* the 16-year-old mother of the child had been sent to a juvenile facility due to truancy from school. The child was left in the mother's parents' custody but was subsequently removed by Children's Services. Mother was then permitted to return to her parents' home, but she had to meet three goals set by Children's Services prior to having the child returned to her. She visited the child once a week on a regular basis for over one year. However, the agency filed a petition to involuntarily terminate mother's rights because it felt she had not done enough to meet the goals. The agency told mother she could no longer visit the child pending disposition of the petition to terminate. The trial court terminated her rights. The Superior Court reversed, stating a settled purpose to relinquish parental rights cannot be based upon failure to contact a child when such contact was forbidden by the agency.

The present case is distinguishable upon the facts. William was never forbidden by Berks County Children & Youth Services to see Ashlee. Ms. Neider told William not to see Ashlee until the investigation was complete. A letter was sent to him when it was completed, yet William did not act. Additionally, Ms. Neider's statement appears to have been more in the form of a request than an order. Furthermore, the mother in *Barnett* repeatedly made attempts to meet the goals imposed upon her to regain her child. William was tardy at best in attempting to re-establish contact. William did not follow through on his referral for counseling at Reading Specialists. He did not send cards or gifts. He has made only sporadic child support payments. William admitted he began to seek contact only when *his* life became more stable and he had settled down. In the same vein,

it can be said that the child's life has also become more settled in that she has developed a stable family relationship with David as her father.

The court must also consider the actions taken by the parent to rehabilitate his parental status after the six-month period, although mere renewal of interest in the child and expression of a desire for return of the child does not negate abandonment. *E.S.M., supra* at 304, 622 A.2d at 392. (citations omitted) William's attempts amounted to seeking legal advice in 1992, which he "gave up" pursuing after phone calls to his attorney revealed Children & Youth Services was being uncooperative in providing certain documents; pursuing expungement not until 1994; and, then, delaying the court proceedings by requesting continuances to enable him to retain counsel. He has done little more to re-establish himself in the child's life.

After the court has determined that the requirements for involuntary termination of parental rights under 23 Pa.C.S. §2511(a) have been met, the court must consider whether or not termination would clearly serve the needs and welfare of the child. *E.S.M., supra.* David has filled a void in the child's life. He loves her dearly, and appears to truly wish to be her father. Furthermore, although Ashlee is aware of who her "real father" is, she sees David as her father and wishes him to be her father. She expressed fear when her father was discussed and stated that she did not wish to see him because he had been mean to her, although she was never specific as to any sexual abuse allegations. She stated to the guardian ad litem that she loved her "new daddy" David and her brother, the child of David and Katherine. Additionally, Dr. Thomas's report supports this court's belief that termination of William's parental rights will best serve Ashlee's needs and welfare.

It is for these reasons that the court enters the following order:

## DECREE NISI

And now, May 17, 1996 the petition to involuntarily terminate the parental rights of William H.B. is granted.

William H.B. shall have 10 days from the date of this order to file exceptions.